**Sandra L. REID, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE, COMPANY, Defendant.**

**Civil Action No. 1:11–cv–2422–AT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 29, 2013.

Heather K. Karrh; Rogers & Hofrichter & Karrh, LLC, for Plaintiff.

Elizabeth Johnson Bondurant; Smith, Moore, Leatherwood Joseph Michael English; Taylor English Duma LLP, for Defendant.

Lewis P. Janowsky; Rynn & Janowsky; Michael David Kata; Wargo & French LLP, for Defendant Kingco Promotions, Inc.

## *ORDER*

AMY TOTENBERG, District Judge.

This case is brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff Sandra Reid ("Reid") contends that Defendant Metropolitan Life Insurance Company ("MetLife") wrongfully terminated her long term disability benefits after 24 months despite substantial medical documentation demonstrating that Plaintiff was disabled due to dementia. Plaintiff further claims that this termination was arbitrary and capricious. This matter is before the Court on Defendant's Motion for Judgment on the Administrative Record [Doc. 24] and Plaintiff's Motion for Judgment on the Administrative Record [Doc. 25]. The Court first sets forth below its findings of fact and thereafter the legal standards of review and an analysis of the evidence in the context of applicable standards.[1]

---

1. The Court has conducted an independent review of the administrative record as well as

## I. FINDINGS OF FACT

Plaintiff filed her Complaint against MetLife on July 25, 2011, under ERISA seeking to recover long term disability benefits under an employee welfare benefit plan offered by her former employer International Business Machines Corporation ("IBM"), plus interest, attorney's fees, and litigation expenses. (Compl., Doc. 1; AR 1–52, AR 52–88.) On October 6, 2011, Plaintiff filed an Amended Complaint to include a claim for benefits under IBM's 401(k) disability protection program, which contributes to a participant's 401(k) account in the event of disability. (Am. Compl., Doc. 12.) MetLife asserted a counterclaim for overpaid benefits in the amount of $50,806.57, relating to Plaintiff's receipt of a retroactive lump sum award of Social Security disability benefits. (Countercl., Doc. 14.) Plaintiff has exhausted her administrative appeal remedies. (Am. Compl. ¶ 25; Answer ¶ 25).

### A. Pertinent Plan Provisions

Effective January 1, 2005, IBM offered its employees a long term disability benefits plan ("the LTD Plan") and 401(k) disability protection program ("the DDP Plan") funded by a group policy issued by MetLife. (AR 1–99.) As an eligible employee of IBM, Reid was a participant in the LTD Plan and the DPP Plan. (Affidavit of Timothy D. Suter, Exhibit 1 to Def.'s Mot., ¶ 4, Doc. 24–2.) Benefits under the Plans are insured by MetLife and MetLife is the claim administrator under the Plans. (*Id.* at ¶ 5.)

The LTD Plan defines "Disabled" or "Disability" to mean that "due to Sickness or as a direct result [sic] accidental injury," a claimant is (1) receiving "appropriate care and treatment," and, (2) "during the elimination period and the next 12

months of sickness, unable to perform each of the material duties" of their own occupation, and (3) "after such period unable to perform the duties of any gainful occupation" for which the claimant is reasonably qualified taking into account their training, education and experience. (AR 22.) However, the LTD Plan contains the following limitation provision for "Disability Due to Mental or Nervous Disorders or Diseases":

> If you are Disabled due to a Mental or Nervous Disorder or Disease, We will limit Your Disability benefits to a lifetime maximum equal to the lesser of:
>
> - 24 months; or
>
> - the Maximum Benefit Period
>
> This limitation will not apply to a Disability resulting from:
>
> - schizophrenia;
>
> - dementia; or
>
> - organic brain disease.
>
> **Mental or Nervous Disorder or Disease** means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic And Statistical Manual of Mental Disorders as of the date of Your Disability. A condition may be classified as a Mental or Nervous Disorder or Disease regardless of its cause.

(AR 39 (hereinafter the "Limitation Provision").) The DDP Plan contains a virtually identical definition of disability and the same Limitation Provision as the LTD Plan. (AR 77, AR 81.) MetLife determines eligibility for benefits under the LTD Plan and the DDP. (AR 33, AR 39, AR 77, AR 81.)

referred to both parties' written submissions in making its findings of fact. In citing to the administrative record, the Court will use the "AR" designation.

## B. Plaintiff's Pre–Disability Claim Employment and Medical History

Plaintiff worked for IBM and IBM's predecessor, AT & T, from 1986 to 2006. (AR 1859–61, AR 998.) From 1999 to 2007, Plaintiff was employed by IBM as an Advisory Project Manager. (AR 1859–1861.) Her job duties included: (1) managing and leading a team on a complex small project, medium size project or significant segment of large hardware and software projects; (2) demonstrating working knowledge in business matters, finance, planning, forecasting and personnel in order to manage team staff and business issues; (3) negotiating effectively with team members to define the team's goals, work content and schedules; (4) communicating team results to immediate management/project manager; (5) establishing and maintaining communication of project status with the project team and other staff; (6) complex problem solving related to various projects or functions; (7) applying creativity and judgment in development of multiple solutions related to project objectives; (8) defining and deciding objectives related to the projects from a cost schedule, technical and quality perspective and providing guidance in these area to others; (9) working with customers/suppliers/IBM staff; (10) identifying estimates and presenting cost, schedule and business and technical risk for projects; and (11) interfacing directly with corresponding levels of customer's staff in carrying out responsibilities for customers' financial baseline of projects. (AR 1862–1862.)

In 2001, Plaintiff began complaining to her doctors that she was experiencing trouble sleeping, and problems with memory, that she had noted decreased retrieval time, slow speech and comprehension, she was mixing words, she found it took a "lot of effort to concentrate," and that it was difficult to make simple decisions. (AR 471–472, AR 930, AR 934, AR 949, AR 952–53, AR 958–59, AR 819.) Plaintiff stated that she had always been an overachiever at work but that she felt humiliated because of these problems and was concerned about her job status. (AR 943, AR 953, AR 958.) Plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and depression and was prescribed numerous medications including Celexa, Wellbutrin, Ritaliln, Buspirone, and Ambien for her symptoms. (AR 825, AR 838.) In 2002 and 2003, her cognitive issues continued with memory and concentration problems, disorganized thoughts, disruptive sleep leading to "inconsistent performance," and struggles with her work schedule. (AR 838, AR 843, AR 848–49, AR 852–853, AR 854, AR855, AR 856–57, AR 861, AR 878–879, AR 808, AR 812.) Plaintiff stated she wanted to improve her memory and concentration so she did not sound like a mentally challenged person. (AR 885–86.) Plaintiff began seeing a psychiatrist, Dr. Rick Stallings, M.D., in June 2002. (AR 836; AR 474.) In 2004, Dr. Stallings referred Plaintiff to Dr. Andrea Carstens, Ph.D. and Clinical Neuropsychologist, for a neuropsychological evaluation. (AR 784.)

According to Dr. Carstens's September 2004 neuropsychological evaluation, Plaintiff was referred by Dr. Stallings to evaluate her concerns regarding problems with memory and concentration that had not improved over the prior three years. (AR 466–470.) The 2004 evaluation references Plaintiff's diagnoses at that time as including Major Depressive Disorder, Single Episode, Partial Remission, and Attention Deficit Disorder. (AR 466.) Dr. Carstens's notes indicate that Plaintiff, who was 48 at the time of the evaluation, "completed the 12th grade and went on to establish an impressive career as a computer systems analyst.... [She] is self-

taught regarding her computer skills and describes herself as a hands-on learner." (*Id.*) Plaintiff reported a history of being extremely well organized but had experienced a change in this area. (*Id.*) Dr. Carstens reviewed Plaintiff's medical records from 2001 forward summarizing her mental health history following her husband's stroke problems and performance problems at work. (AR 467.) Dr. Cartsens noted that while Plaintiff was treated for depression and Attention Deficit Disorder, her cognitive difficulties were ongoing. (*Id.*) Dr. Carstens also noted Plaintiff's family history of Alzheimer's. (*Id.*)

Dr. Carstens's 2004 report reflects Plaintiff's reported problems with job performance:

> Ms. [Reid] works from home for IBM, doing consulting regarding the acquisition of computer projects and system support. She works approximately 10 hours a day. Her last performance evaluation in February of 2004 for her work in 2003 had dropped from a highest category to a satisfactory category. She was noted to not be timely in her work completion. She reports this is related to a decline in her organization, and general forgetfulness. She has missed conference calls that she is hosting, despite computer reminders. She gets projects and people assigned to them mixed up. She notes that her job has always been quite stressful and demanding and that there has been an increase in her responsibilities. She reports that at times she approaches quite familiar and routine tasks and forms and draws a blank.

(AR 467.) Plaintiff reported poor concentration and problems with comprehension for both written and verbal communication. (*Id.*) She indicated feeling that her "conversation is 'all over the place,' as though her mouth and mind are out of sync" and a possible decline in spatial processing based on recent experiences getting lost in previously familiar places. (AR 468.) Plaintiff indicated she was "most concerned about her inability to recognize or recall personal experiences when looking at family photographs from less than 10 years ago. Despite a variety of prompts from family members, she has no recollection of herself in these scenes. She has difficulties remembering appointments and deadlines." (*Id.*)

Dr. Carstens administered several cognitive testing protocols including Cognistat, the Wechsler memory Scale–III, the Rey–Complex Figure Test, the Trail-making Test, the Finger Tapping Test, the Wide Range Achievement Test–3, the HANDS Depression Screening Tool, and the Burns Anxiety Inventory. (AR 469–470.) Dr. Carstens summarized Plaintiff's test results as follows:

> The results of this neuropsychological evaluation were abnormal, reflecting mild deficits in attention, working memory, processing speed and written arithmetic. Her speech is disorganized. Normal scores are seen on tests of motor fluency, memory for stories, word list delayed recall, reading recognition and aspects of visual memory. Her deficits are occurring in the context of significant stress and documented Depression and Attention Deficit Disorder. However, her presentation is not fully explained by these factors, and there is concern for the family history of early onset Alzheimer's. Her cognitive performance is consistent with Cognitive Disorder NOS [Not Otherwise Specified].

(AR 470.) Dr. Carstens's observations of Plaintiff during testing were that "she presents as having above-average intelligence, based on her speed of processing and conversation. However, her conversa-

tion was a little hard to follow at times, being somewhat disorganized. . . . She did have episodes of 'blanking out' on recall tasks, momentarily unable to recall any information." (AR 468.) Dr. Carstens's interview notes indicate that Plaintiff had "clear problems with working memory, disorganization of speech not easily explained by depression or ADD." (AR 776.) Dr. Carstens reported that Plaintiff was cooperative during the evaluation and "there were no concerns about malingering or poor effort. The results of testing are considered accurate." (AR 468.)

In 2005, Plaintiff was released from counseling for depression. (AR 754–AR 756.) However, she returned to Kaiser Permanente Behavioral Health on October 26, 2006, following a divorce because of problems at work, anxiety, depression, and issues with her memory, concentration, and thinking. (AR 752–53.) Dr. Stallings attributed Plaintiff's problems to her prior diagnoses of ADHD and depression. (AR 747–48.) Plaintiff began taking Adderall, which she reported "helped some but it feels like there is still a ways to go." (AR 739.)

On June 13, 2007, Plaintiff was diagnosed with Bipolar Disorder after reporting symptoms of memory problems, difficulties in formulating words and thoughts, embarrassment at work due to a decline in skills, behavioral changes in spending too much money on jewelry, and difficulties with processing information and making decisions. (AR 719.) Plaintiff stopped working altogether on June 25, 2007. (AR 693.)

On June 27, 2007, psychiatrist Reed Pitre, M.D., met with Plaintiff for a "medication consultation." (AR 692–703.) In addition to severe symptoms of depression, anxiety, and mania, Plaintiff reported experiencing "disorganized thoughts with thought blocking." (AR 693.) Dr. Pitre

prescribed Lithium to treat Plaintiff's mixed mania symptoms and racing thoughts and prescribed Risperdal to treat Plaintiff's psychotic symptoms, thought blocking, anxiety and insomnia. (AR 695.) On July 3, 2007, Dr. Pitre followed up with Plaintiff who reported that the she felt "slightly less disorganized than before on Lithium and Risperdal." (AR 680.) Dr. Pitre also ordered a brain MRI to rule out organic causes of Plaintiff's symptoms. (AR 680–681.) On July 12, 2007, Dr. Paula R. Greenfield, M.D., reviewed the MRI of Plaintiff's brain and noted "moderate to severe cerebral atrophy" and indicated that no masses were identified. (AR 683.) Ms. Reid was then 51 years old. On July 13, 2007, because of the abnormality on the MRI, Dr. Greenfield ordered a CT scan to rule out meningomas/tumors. (AR 1434–1435.) Dr. Greenfield noted "some dense calcification along the falx" but ruled out the presence of meningiomas, therefore indicating a normal impression of the brain. (AR 1434.)

### C. Plaintiff's Long Term Disability Benefits Claim

On November 29, 2007, Plaintiff made a claim for long term disability benefits with IBM supported by a Statement of Attending Physician from her psychiatrist, Rick Stallings, M.D. (AR 1295–1298, AR 1871–1874.) The claim was based on a Primary Diagnosis of "Bipolar I Disorder, Mixed, Severe w/ Psychosis" and Secondary Diagnoses of Cognitive Disorder and Monoclonal Gammopathy. (AR 1294–1295.) In support of his diagnosis of Bipolar Disorder, Dr. Stallings listed the following as his "Objective Findings:" "depressed mood, blunted affect; decreased short term memory." (AR 1295.) In support of his diagnosis of Cognitive Disorder, Dr. Stallings referenced the July 2007 MRI/CT scan under "Objective Findings" and un-

der "Subjective Symptoms" he listed "decreased cognitive functioning." (AR 1295.) Finally, Dr. Stallings indicated that Plaintiff suffered from a Class 5 Mental/Nervous Impairment with "significant loss of psychological, personal and social adjustments." (AR 1298.) The November 27, 2007 Statement of Attending Physician provided by Dr. Stallings indicates that he did not advise Plaintiff to return to work and listed her restrictions as "cannot be responsible for activities requiring focus/concentration" and her limitations as "has current [low] ADLs [activities of daily living]—appears intermittently disheveled." (AR 1297.) Dr. Stallings further declared that Plaintiff was disabled from both her own occupation and any occupation. (AR 1298.)

On December 3, 2007, Mark Womack, LCSW, completed an "IBM Medical Treatment Report–Psychiatric Impairment Rating" documenting Plaintiff's levels of impairment. (AR 1882.) Mr. Womack responded that Plaintiff was severely impaired with respect to social and recreational activities associated with her daily living. (*Id.*) Under the heading "Thinking, Concentration, Persistent and Pace" he stated that she was severely impaired in her ability to maintain attention, concentrate on a specific task and complete a task in a timely manner, in both her immediate and remote memory, and in her ability to perform daily tasks (including work) that she previously performed at a reasonable pace. (*Id.*) He noted serious impairments in her problem solving and conceptional reasoning ability and in her ability to initiate decisions and perform planned actions. (*Id.*)

On December 19, 2007, MetLife acknowledged receipt of Plaintiff's LTD application and requested additional information necessary to evaluate her claim for benefits. (AR 1635.) Specifically, Met-

Life requested Plaintiff provide the following information by January 3, 2008:

- Copies of the last 3 office visit notes from all of your current treating physicians including:
  - mental status exam and cognitive test results,
  - treatment plan and medication list with dosages,
  - response to treatment,
  - current restrictions and limitations,
  - return to work prognosis,
  - Completed Psychiatric Questionnaire,
- Completed Personal Profile Evaluation form (enclosed with this letter),
- Proof of filing for Social Security Disability Income (contact SSA).

(*Id.*) On December 20, 2007, Reid participated in a telephone interview with MetLife regarding her LTD/401K protection benefits. (AR 107–116.) When asked to describe the symptoms that prevented her from working, Plaintiff stated: she could not concentrate, she had difficulty with writing and her spelling was poor, she felt as if she were hearing voices, she had an impaired memory, she could not comprehend information, she had sleeping problems, and she was agitated easily. (AR 109.) Plaintiff identified her medications at that time as: Lamictal, Bupropion, Provigil, Lithium, Carbonate ER, Risperdal, Benztropine, Mesylate, Zolpidem, and Furosemide. (AR 110.) She stated that the side effects were constant dry mouth, tremors in hands, concentration problems and disorganized thoughts. (AR 111.)

Plaintiff and her doctors submitted the requested information to MetLife in support of her application for LTD benefits. (AR 1636–1864.) On December 28, 2007, Mark Womack, LCSW, provided the requested Psychiatric Questionnaire (along

with copies of Plaintiff's progress notes and other testing) stating that Plaintiff exhibited the following symptoms that would impair her from working: impaired cognitive ability, thinking, memory, crying and irritability, anxiety as evidenced by allowing bills/utilities to go unpaid and lost blocks of time. (AR 1648—1649.) Mr. Womack described Plaintiff's primary work responsibilities as "project mgr—requires regular interaction w/ co-workers + attention to detail—both are not possible at this time." (AR 1648.) Mr. Womack indicated that he recommended that Plaintiff stop working on June 26, 2007, participate in daily group therapy, and provided an estimated return to work date of March 31, 2008. (AR 1649.) He also provided copies of Plaintiff's progress notes from September 2007 through January 3, 2008, (AR 1658-1857), and the August 2007 neuropsychological evaluation performed by Andrea Carstens, PhD., providing a primary diagnosis of Cognitive Disorder. (AR 1651-1657.)

In 2007 and at the age of 51, Plaintiff was again referred by her psychiatrist, Dr. Reed Pitre, M.D., to Dr. Carstens for a neuropsychological evaluation to address Plaintiff's concerns regarding memory in the context of her Bipolar Disorder. (AR 1651.) The 2007 report references Plaintiff's prior neuropsychological evaluation in 2004. (*Id.*) Plaintiff was accompanied by a friend who participated in the interview and who noted "significant cognitive and behavioral decline in the last year, resulting in Intensive outpatient treatment and short term medical leave from her job since June 2007 for treatment of bipolar disorder." (AR 1655.) The report indicates that Plaintiff's friend completed a Clinical Dementia Rating noting "no problems with personal care, questionable problems with orientation and community affairs, and mild impairment with memory, problem solving and home hobbies." (*Id.*)

Dr. Carstens's report further noted Plaintiff's family medical history of schizophrenia, depression, bipolar disorder, and Alzheimer's. (AR 1652.) Plaintiff presented with an "ABNORMAL mental status" relating to her (1) speech: "some dysfluencies and word finding problems," (2) affect: "Decreased Range, Congruent with Mood and Depressed," and (3) memory: "Fair." (*Id.*) During intake, Dr. Carstens noted problems with Plaintiff's executive functioning as reflected by her descriptions of the clutter in her home "due to piles of paperwork, abandoned hobbies and unnecessary purchases." (AR 1653.) Dr. Carstens's intake notes further reflect that Plaintiff's speech was tangential and that she had poor remote and recent memory. (*Id.*) With regard to academics, Dr. Carstens noted that Plaintiff has "difficulty remembering or recalling what she reads. Avoids sustained mental activity, overpays bills; has not completed her taxes in 3 years." (*Id.*) Dr. Carstens's Report refers to Plaintiff's 2007 MRI showing "moderate to severe atrophy, worse for the occipital lobes bilaterally." (*Id.*)

Dr. Carstens observed that Plaintiff presented with "apparent average intelligence," but her test results demonstrated a "Full Scale IQ of 79, which falls at the upper limit of the Borderline [intellectual functioning/mental retardation] range, at the 8th percentile" and her Verbal (81/10th percentile) and Performance (80/9th percentile) IQ levels both fell in the Low Average range. (AR 1653.) Dr. Carstens noted that Plaintiff's index scores were more informative showing:

average Verbal Comprehension (91) and below average Perceptual organization (88). Working memory and processing speed were 73, both falling in the borderline range. These latter scores are

significantly lower than her verbal and perceptual indices. These scores would predict problems with concentration, short term memory and paperwork. (AR 1653–1654.) In addition, Plaintiff's verbal subtest scores generally fell below average, with the exception of her Information and Vocabulary scores that were both average. (AR 1654.) Dr. Carstens stated that Plaintiff's "scores certainly suggest some decline in working memory and processing speed relative to previous functioning, based on her achievement testing and occupational attainment. As this test was not given previously, it is not possible to calculate a course of decline." (Id.)

Plaintiff scored within the average range on the cognitive screening test "Cognistat," a neurobehavioral cognitive status examination screening tool to sample skills in the areas of orientation, attention, language, construction, memory, calculation and reasoning. Dr. Carstens noted that Plaintiff "improved on the attention subset, which formerly fell in the range of mild impairment. Memory was strong." (AR 1653.) On the WSM–III Logical memory and word list subtests, Plaintiff was mildly impaired for both verbal memory at immediate recall and verbal learning, average for verbal memory and verbal learning at delayed recall, and below average for recognition. (AR 1654.) Plaintiff showed improvement from the 2004 neuropsychological evaluation on her visual memory from mild impairment to average or below average. (Id.) Plaintiff scored below average on Trail Making Tests administered to assess processing speed. (Id.) However, on Part B of the test that measures processing speed and divided attention, Plaintiff completed the test in 102 seconds, faster than her previous score of

114 in 2004. (Id.) Plaintiff obtained an average score of 107 for reading recognition on the WRAT–3, but showed significant improvement relative to her previous score of 94. (Id.) Her score for written math achievement of 81 was below average and did not significantly differ from her previous score of 84. Plaintiff showed significantly more depression and anxiety on the HANDS depression screening tool relative to her previous scores. (Id.) On the MMPI–2, Plaintiff produced a profile of marginal validity "because she presented herself in an overly positive light, which may [have] result[ed] in an underestimate of her problems." (Id.)

Dr. Carstens observed that Plaintiff's "concentration during testing was variable" and that she "worked slowly on the MMPI–2, appearing to have difficulty deciding on her response" and at times would get distracted by noises outside the room. (AR 1653.) However, Plaintiff evidenced good effort during testing and the results were considered accurate. (AR 1653.) In summary, Dr. Carstens stated:

> Ms. Reid presents with cognitive concerns which are almost identical to those voiced in her previous evaluation in 2004. Her friend notes significant cognitive and behavioral decline in the last year, resulting in Intensive outpatient treatment and short term medical leave from her job since June 2007 for treatment of bipolar disorder. Testing shows some improvement since 2004 in the areas of attention (digit span repetition), visual-spatial processing and visual memory, left hand motor speed and reading recognition. There is a slight decline in word list learning and recall of concern, given the family history for Alzheimer's, and her CT[2] showing mod-

**2.** Several of the doctors who reviewed the results of Plaintiff's July 2007 MRI and CT scans would refer to the tests interchangeably therefore referring erroneously to the July 13,

erate to severe cerebral atrophy. New testing (WAIS–III) indicates likely declines relative to remote functioning, in the areas of working memory and processing speed. She is still evidencing some symptoms of bipolar disorder and her self report shows increase in depression and anxiety relative to 2004. Personality testing is consistent with somatoform disorder, with significant depression and tension. Thus, she is still showing signs of cognitive disorder which has not clearly worsened, but the question of etiology (bipolar disorder vs. early dementia) remains.

(AR 1655.)

On January 3 and 4, 2008, Plaintiff filled out a Personal Profile form for MetLife describing her current condition. (AR 1637–1638, AR 1642–1645.) Plaintiff responded that she had a loss of interest and motivation with regard to most activities, she found it very difficult to complete tasks such as filling out this form, she had suffered a loss of concentration and focus, she had problems with typing, managing her checkbook, paying bills in a timely manner, handwriting and spelling, she was easily agitated, and she had auditory hallucinations. (AR 1637.) Plaintiff further stated that she had experienced changes in her ability to care for her personal needs and grooming: "No daily showers. Now shower once every 4–5 days. Do not care about my appearance as I did in the past. No interest in putting on makeup and /or lipstick or collone [sic] everything takes so long to do." (AR 1638.) Plaintiff also responded that she had difficulty performing daily household tasks such as cleaning and grocery shopping. (AR 1645.) As a result of her "inability to stay focused/concentrate," Plaintiff stated that she no longer had interests, hobbies, or participated in social activities such as going for walks, seeing movies, sewing, fishing, watching television, and playing billiards. (AR 1645.)

### D. MetLife's LTD Coverage Determinations

On January 11, 2008, MetLife notified Plaintiff that her claims for benefits under the LTD Plan and the DDP 401(k) Plan had been approved effective December 22, 2007. (AR 1620–1623.) MetLife further notified Plaintiff that because their records showed her disability was due to a mental and nervous condition, her benefits would be limited to 24 months and that benefits would end on December 21, 2009. (AR 1620–1621.) MetLife's Claims Activity Log indicates that its decision was based on a primary diagnosis of Bipolar Disorder with a co-morbid diagnosis of Cognitive Disorder and notes her symptoms of depressed mood, blunted affect, decreased short-term memory, decreased organization, decreased ADL's (activities of daily living), irritability, auditory hallucinations, and decreased cognitive functioning. (AR 147–48.)

On April 11, 2008, MetLife informed Plaintiff that "[y]our current claim for long term disability benefits is currently approved because you are totally disabled from performing your own job. For benefits to continue beyond 12/22/2008, you must be totally disabled from performing any occupation." (AR 1981–1982.) As Plaintiff's estimated return to work prognosis was listed by her doctors as July 1, 2008, MetLife consulted with Plaintiff's medical providers, Dr. Stallings and Mr. Womack who provided additional medical documentation to support a continuation of her benefits for disability for any occupation. (AR 171–77.) MetLife's Claims Activity Log in April 2008, indicates Met-

---

2007 CT scan as showing the cerebral atrophy as opposed to the July 12, 2007 MRI.

Life's concern that if Plaintiff's doctors did not advise her to return to work, it would be necessary to determine if Plaintiff was disabled due to any other medical conditions and notes: "Organic psychosis[3] was given as a DX [diagnosis] previously. CM will make sure PCS follows up on that to determine if there is medical to support and this would be an exclusion to the claim" (meaning the benefits would not be subject to the Limitation Provision). (AR 181–82.) The June 2008 Activity Log summary further acknowledges that Plaintiff's medical records demonstrated the potential presence of a covered disability in addition to her Bipolar diagnosis:

> when obtaining medical update from APS [attending physicians], please inquire whether [employee's] condition is the result of something organic going [on]. We have medical info from Dr. Carstens that continues to state [employee's] primary diagnosis is organic psychosis. We are reviewing claim for transition at this time, we need to investigate this as organic brain disease is an exclusion to the LDB [limited disability benefits].

(AR 187.)

Based on its investigation in April and July 2008, and due to the severity and extent of her symptoms of Bipolar and Cognitive Disorder, MetLife concluded that Plaintiff was unable to perform the functional requirements as an advisory project manager on an ongoing basis which requires the ability to focus and concentrate on work procedures, have energy and stamina to perform work tasks, interact appropriately with co-workers, and control emotions in the workplace. (AR 178–182, AR 191–194.) On November 13, 2008,

MetLife received updated medical records from Plaintiff's therapist Mr. Womack noting that her Bipolar disorder was in partial remission but that her Cognitive Disorder diagnosis remained and prevented her from returning to work before February 2, 2009. (AR 205–206.)

On November 11, 2008, Reid was evaluated for double vision. (AR 1529.) Plaintiff reported her neurological symptoms at the time included gait disturbance, impaired coordination, imbalance, memory loss and tremors. (*Id.*) Plaintiff's ophthalmologist referred her for these additional scans as a result of Plaintiff's complaints regarding her double vision. On December 4, 2008, as a result of her diplopia (double vision), Plaintiff underwent an MRA of the head and neck and an MRI of the pituitary, brain, and brain stem to determine neurologic causes of her double vision. (AR 1424–28.) The results from the 2008 scan were noted as follows:

> The pituitary gland demonstrates normal size and contour. No displacement of the pituitary stalk is seen. The pituitary shows normal signal without contrast, without evidence of hemorrhage. It demonstrates normal homogeneous enhancement. The suprasellar cistern is clear. Both cavernous sinuses appear intact.
>
> T2 images of the entire brain demonstrate no signal abnormality. The ventricles are normal in size. No abnormal brain enhancement is seen.
>
> Impression:
>
> No evidence of pituitary adenoma.
>
> Otherwise unremarkable brain.
>
> · · ·
>
> MRA brain:

---

**3.** It appears that MetLife characterized Plaintiff's cognitive disorder as "Organic psychosis." This is consistent with American Psychiatry Association's discussion in the DSM– IV–TR that cognitive disorders were historically referred to as organic brain disorders. *See* DSM–IV–TR at 135.

Technique:

Thin section axial images were obtained, and multiple projection reconstructions performed.

Examination shows no evidence of stenosis or occlusion.

No aneurysm is identified. No arterial malformation is seen. Impression: Normal.

(AR 1424–25.)

On December 10, 2008, MetLife notified Plaintiff that it had completed its review of her claim for continued long-term disability benefits (beyond the first 12 months of disability for her own occupation) and found that the information on file supported continued approval of her claim for disability benefits. (AR 1555.) MetLife further stated that it would periodically require Plaintiff to provide updated information concerning her disability and asked that Plaintiff advise MetLife "of any changes that might affect [her] benefits, such as a change or improvement in [her] medical condition(s), a return to work, or receipt of other income." (*Id.*) MetLife's Claim Activity Log indicates that its determination was based on Primary diagnosis of Bipolar and a comorbid diagnosis of Cognitive Dysfunction/Disorder. (AR 214–217.)

Plaintiff kept MetLife informed of changes in her medical history, including problems with her vision, a second round of brain scans, and a second neuropsychological evaluation. (AR 216–252.) MetLife continued to solicit and receive updated medical information regarding each of the Plaintiff's conditions. (*Id.*) On March 18, 2009, the Claim Activity Log states:

Per recent review of updated medical info, PCS recommends medical supports a severity of impairment due to severity of symptoms noted.... There

is no information to indicate a significant positive change or improvement in [employee's] condition since the last clinical review. All diagnoses include bipolar I disorder, cognitive disorder, neuropathy, hearing loss, TMJ, sleep apnea, and MonoclonParaproteinemia. Bipolar disorder is an LDB [limited disability benefits].... Based on [employee's] clinical history, continued symptomology such as mania, cognitive deficits especially with poor short term memory, impulsive spending and isolative behavior, PCS recommends that medical supports a severity of impairment. Information from Dr. Stallings and L.M. Womack, LCWS dated 2/16/09. Diagnosis is bipolar I disorder.... Based on the info above, ltd. benefits will continue....

(AR 230–32.) In late April and early May of 2009, the MetLife claim manager assigned to Plaintiff's file conducted a clinical consult with Sheila Donoghue, a MetLife "Psych. Clin. Spec." and the notes state as follow:

See diary dated 4/18/09 for summary of updated medical info received from [employee's] psychiatrist. Ap [attending physician] notes organic psychosis and has referred [employee] for revised neuropsych testing. PCS to review [the] information and f/u [follow up] for neuropsych test results and other info needed to prove [employee] has organic psychosis. This may support there is an exclusion and benefits could possibly continue beyond ldb [limited disability benefits] end date of 12/21/09.

(AR 248.) However, on May 13, 2009, MetLife completed a "subsequent claim decision" stating "[t]he clinical information from Dr. Stallings and Mark Womack indicate the primary diagnosis that impairs

functionality is bipolar disorder.[4] This is not an exclusion to the ldb. While employee is reporting cognitive limitations, particularly problems with memory, there are no clinical findings to evidence a cognitive disorder or an organic brain disorder. If there is any new or additional clinical information received to indicate a change in the primary diagnosis or [employee's] return to work ability cms may refer to pcs for review." (AR 253–54.)

On June 10, 2009, Plaintiff (age 53) underwent a third neuropsychological evaluation performed by Teresa Whitehurst, PhD, Clinical Psychologist. (AR 1448–57.) Dr. Whitehurst's report was finalized on September 11, 2009. (AR 1451–1457.) Plaintiff was again escorted by a friend who stays with her 4 to 5 months at a time who also participated in the interview. (*Id.*) Dr. Whitehurst stated that Plaintiff's illness was chronic and that the onset was gradual, "especially last year and a half." (AR 1448.) During intake, Dr. Whitehurst reported that Plaintiff had problems with her speech, executive functioning, concentration, and memory. (*Id.*) Plaintiff also reported blank periods, "especially in the Fall of 2008 when she apparently ordered a lot of expensive diamond jewelry," and episodes of disorientation while driving. (*Id.*) Plaintiff reported that she felt flat and that she just did not care about things anymore and her friend reported that "this has been a 180–degree change over last year: 'very very very flat affect.'" (*Id.*) Plaintiff's friend also indicated that Plaintiff "used to be an excellent housekeeper and 'the consummate entertainer'" but that now her house was a mess with piles of laundry. (*Id.*) Plaintiff still suffered from manic episodes, auditory hallucinations, and excessive worry and anxiety resulting from her financial problems. (*Id.*)

Dr. Whitehurst reviewed the medical reports of Plaintiff's brain imaging including the 2008 MRI of the pituitary and the July 2007 MRI showing moderate to severe atrophy of the brain. (AR 1452.) Dr. Whitehurst conducted many of the same tests as those performed by Dr. Carstens in 2007. Dr. Whitehurst summarized the results as follows:

> Testing revealed severe impairment across domains and tasks in both verbal and visual memory, as well as cognitive processing speed, simple and divided attention and cognitive flexibility.... Reading and arithmetic computation skills were average and low average respectively.... Reid reported severe anxiety and depression symptoms. *The primary diagnosis based on test profile is dementia with the flavor of frontotemporal dementia with regards to patient's and friend's emphasis on "flat affect."* It should be noted that personality/emotional factors may be playing a significant albeit undetermined role, contributory and/or consequential with regards to attention, cognitive acuity and concentration. In addition, financial stressors from quite expensive recent purchases ... are contributing to anxiety about money management.... Finally, dissociative processes cannot be ruled out and may be related to organicity and/or to emotional factors. Further exploration of the nature of dissociative symptoms ... is recommended. If cognitive symptoms continue to worsen, repeat brain imaging is recommended.
>
> Assessment: (DSM IV–Tr)

---

**4.** A subsequent entry on May 13, 2009, further states that "No co-morbids indicated. Medical continues to support from a psych standpoint.... If employee does not return to work would recommend updated clinical information be obtained which should include neuro results planned for 6/10 as well as updated clinical from Dr. Stallings and Mark Womack counselor." (AR 254.)

Axis I  Dementia Bipolar I Disorder r/o Alzheimer's disease early onset, r/o dissociative disorder

Axis II  deferred

Axis III  Bipolar I Disorder, Mixed, Partial Remission, Sleep Disorder, Sleep Apnea, Cognitive Disorder, Monoclonal Gammopathy, Undetermined Significance, Hearing Loss, Mixed Conductive Sensorineural Neuropathy, Peripheral TMJ Disorder

(AR 1456 (emphasis added).)

On October 7, 2009, Plaintiff spoke with a MetLife claims representative and advised that she had additional medical information regarding another diagnosis of a brain disorder and she would fax the information to MetLife. (AR 268). MetLife's Activity Log indicates that it had not received any updated medical information regarding Plaintiff's new diagnosis of a brain disorder as of October 21, 2009;[5] but noted that MetLife would conduct a review to determine whether benefits should continue beyond the limitation period upon receiving a supporting Attending Physician Statement. (AR 269–270.)

On October 21, 2009, and without reviewing Dr. Whitehurst's neuropsychological evaluation, MetLife notified Plaintiff that her disability benefits would end on December 21, 2009, as their records showed that her disability was due to a mental and nervous diagnosis for which benefits are limited. (AR 1437.) MetLife explained that Plaintiff could qualify for disability benefits beyond December 21, 2009, if she were able to demonstrate that her disability was due to other non-limited medical conditions and advised Plaintiff to submit certain information regarding any other medical conditions she suffered from, including office visit notes, diagnostic test results, lab results, treatment plans, etc. (*Id.*) MetLife also informed Plaintiff of her right to appeal the determination to limit her benefits to 24 months. (AR 1435.)

On November 3, 2009, Plaintiff contacted MetLife to inquire "about the medical info. on file and the exclusions as noted in the plan" and MetLife explained that if Plaintiff's health care providers submit medical records showing that Plaintiff's disabling condition was the result of schizophrenia, dementia, or organic brain disease, there would be no limitation on benefits for long term disability." (AR 271.) Plaintiff informed MetLife that her attending physician had sent information stating that she has cognitive dysfunction and dementia and the claims representative advised that MetLife would take another look at the claim to determine whether the medical records supported a disability diagnosis of dementia. (AR 271–72.) The Claim Activity Log reflects that the MetLife claims representative requested another clinical consult after speaking with Plaintiff: "please re-review information received from Mark Womack LCSW[6]. Plaintiff had neuropsych testing on 9/11/09 and it was determined she had dementia, bipolar, r/o early onset of Alzheimer's and r/o dissociative do. See dcn 090914F10090 p. 18.... Per the plan, dementia is an exclusion. CM feels this claim should remain open and benefits continue as ldb no

---

5. The Activity Log does not indicate when exactly MetLife received the results of Plaintiff's June 2009 neuropsychological evaluation, the results of which were completed on September 11, 2009. However, it appears from the record that Dr. Whitehurst's report was faxed to MetLife on September 14, 2009. (AR 1448–1457.)

6. Mr. Womack faxed Dr. Whitehurst's neuropsychological evaluation to MetLife on September 14, 2009. Therefore, the information "received" from Mr. Womack appears to be Plaintiff's 2009 neuropsychological evaluation.

longer applies as of 9/11/009. Please advise if you agree or not." (AR 272–3.)

On November 6, 2009, MetLife conducted an interview with Plaintiff to discuss her most current symptomatology and course of treatment. (AR 273–276.) Plaintiff stated that the symptoms she felt were the most predominant were those resulting from her dementia based on her two neuropsychological evaluations in 2007 and 2009 and the MRI showing moderate to severe cerebral atrophy. Plaintiff explained that she gets lost while driving, cannot recollect recent conversations with others, she gets confused and that when she talks "it is like a blank screen," and feels flat. (AR 274–75.) She also explained that depression kept her from doing a lot of things. (AR 274–75.) That same day, MetLife referred Plaintiff's file to an Independent Physician Consultant Keven Murphy, Licensed Psychologist, for review of her medical records in order to verify Plaintiff's dementia diagnosis based on her psychological testing. (AR 276–277.) The Claim Activity Log states "Pcs and ipc discussed test results and the possibility of dementia type symptoms related to bipolar disorder. Testing does have suspicious concerns but not exactly clear of convinced dementia dx: Dr. Murphy feels a call to provider who conducted testing would be beneficial for firm dx." (*Id.*)

On November 9, 2009, Dr. Murphy spoke with Dr. Whitehurst who "seemed fairly sure that the claimant had a dementia." (AR 276–77.) According to Dr. Murphy, Dr. Whitehurst thought that Plaintiff did not give her best effort on one of the measures and said that Plaintiff's affect was so flat that it was hard to tell if severe apathy was affecting effort. (AR 277–78). Dr. Whitehurst's report indicates that

Plaintiff related well and was alert during the interview and testing. (AR 1454.) Dr. Whitehurst's only noted concern evidenced in her report was to the validity of Plaintiff's executive function testing due to Plaintiff's "response patterns." (AR 1456.) On November 10, 2009, MetLife's "Psyc. Clin. Spec." Donoghue reviewed Plaintiff's case with Dr. Murphy:

> per [Dr. Murphy's] discussion with Dr. Whitehurst for reasons MRI being read as normal while the CT scan was read as abnormal and demonstrating significant atrophy. If one or the other demonstrated atrophy Dr. Murphy felt that would be enough evidence given the other information. The claimant demonstrated some improvement in 2007 when compared to 2004 according to Dr. Cartens's report of 2007 (2004 not in file only referenced). She did much worse this time (2009) but also seemed more depressed and lacking effort on one measure with no formal effort measures administered. Still can not differentiate between a dementia and depressive pseudodementia with full confidence based on information in file. Her performance remains suspicious for dementia but it is difficult to tell given her current level of depression which may account for her flat affect and apathy. Possible directions obtain all imaging studies and 2004 neuropsych report.

(AR 279–280.) MetLife requested copies of Plaintiff's brain imaging scans and the 2004 neuropsychological evaluation performed by Dr. Carstens.[7] (AR 280–286.) On November 17, 2009, Plaintiff's psychiatrist Dr. Stallings completed and returned to MetLife an Attending Physician Statement and Psychiatric Questionnaire indicating diagnoses of bipolar I disorder and

---

7. The Claim Activity Log indicates that MetLife had copies of Plaintiff's 2008 imaging results ordered by her ophthalmologist as of May 13, 2009. (*See* AR 255–56 (describing result of November 2008 MRA and MRI results).)

a cognitive disorder/dementia and stating that because Plaintiff "has had a significant decline in function: she would be unable to perform the tasks required for any job." (AR 1003–07.)

The Claim Activity Log indicates that MetLife conducted a "subsequent claim decision" on November 23, 2009, and determined:

> claim is reaching ldb max date on 12/21/09. [Employee] suffers from bipolar affective do, mixed and ap [attending physician] noted organic psychoses but there was no medical information provided to support this diagnosis. [Employee] is gathering the medical info to support and show she has dementia, which could allow her benefits to be extended. To date, we have not received this info and will continue with the claim closure. Once the medical is received, it will be reviewed to see if benefits can be extended beyond the ldb end date. Therefore, claim is closed due to claim has reached max duration and benefits are longer payable.

(AR 286–87.) A subsequent log entry from that same date indicated that upon receipt of the requested medical information from Plaintiff, MetLife would determine if the claim would be reinstated and benefits extended beyond the limited disability end date of December 21, 2009. (AR 287.) On November 24 and 25 of 2009, MetLife reviewed the updated medical records received from Dr. Stallings referencing Plaintiff's 2009 neuropsychological evaluation results showing an Axis 1 diagnosis of dementia and noting that Plaintiff's cognitive symptoms as chronic and the degree of her impairment as continuing to be quite significant. (AR 289–290.)

On November 30, 2009, MetLife again notified Plaintiff of its determination that her benefits were subject to the Limitation Provision for mental and nervous disorders. (AR 1979–1980.) Specifically, MetLife stated,

> In reviewing your file, the medical documentation indicates that you are disabled due to bipolar affective disorder, mixed and organic psychoses. We have not received any medical information to support the presence of organic psychoses. These diagnoses falls [sic] under the limited benefit provision of your Plan, and has a limitation of 24 months.

> Based on a review of your entire file, we have determined you will have received the maximum benefit period payable under your Plan for this condition on December 21, 2009. No additional benefits will be payable after December 21, 2009 and your disability claim will have been paid in full in accordance with the terms of our employer's disability plan.

(AR 1979.) MetLife notified Plaintiff that she had 180 days to submit an appeal and suggested that if she intended to appeal that she provide a written statement requesting an appeal, copies of the last 3 office visit notes, current treatment plan with medication list and dosages, current restrictions and limitations, most recent test results, and return to work prognosis for any other non-limiting disabling medical conditions. (AR 1980.)

MetLife's Activity Log indicates that after it notified Plaintiff on November 30, 2009, of its decision to limit her benefits, MetLife completed its consultation with its Independent Physician Consultant ("IPC") Dr. Murphy in early to mid-December. Dr. Murphy provided a report of his opinions dated December 14, 2009, summarizing certain of Plaintiff's medical records and the 2007 and 2009 neuropsychological evaluations. (AR 1378–87.) Dr. Murphy concluded that "from a psychiatric standpoint, the medical information in file supports a diagnosis of Bipolar Disorder I. . . .

[T]he claimant has cognitive deficits associated with her Bipolar Disorder [and] [h]er longstanding memory complaints appear to be due to a pseudodementia associated with depression." (AR 1386–1387.) Dr. Murphy provides the following explanation of his conclusion:

> She has had cognitive complaints for the last 5 years with fluctuating findings on the 3 neuropsychological evaluations. Functionally, she has had significant problems with concentration, pace and task completion that would affect her ability to perform job duties. . . . The results of a single neuropsychological examination are difficult to use in determining whether areas of cognitive difficulty are attributable to Bipolar Disorder or represent the early signs of dementia. Repeated neuropsychological assessment is the best method for documenting a progressive decline in cognition that would be found in a condition such as dementia, Alzheimer's type. Fluctuation in cognitive functioning, where some areas improve and other worsen with no clear neurologically based pattern is more consistent with a history of depression than dementia. The claimant demonstrated more areas of improvement than decline when the results of 2007 were compared to those of 2004. In most diagnosable dementias scores on memory testing are significantly lower than the results of intelligence testing: This was not true for the claimant as of the assessment in 2007. The claimant was seen by a neurologist, Dr. Clairborne [Plaintiff's ophthalmologist], on November 11, 2008. The only abnormal finding was of a mild tremor. The MRA and MRI of December 2008 were within normal limits; laboratory results were also reported. Although there was the report of a CT scan demonstrating atrophy in a neuropsychological report, the CT scan of July 17, 2007 was normal.[8] The chart was thoroughly reviewed for other indications of dementia aside from the neuropsychological report of June 10, 2009 including the CT scan documenting atrophy and neurologist visits but there was no support for this in file. Due to her concerns about her finances, she appears to have exaggerated her functional difficulties on the examination of June 10, 2009. . . . Of note, memory complaints of losing time for 2 to 3 hours or for half a day are not suggestive of dementia. Reports of buying things from the shopping channel and not remembering having done that are also atypical. These complaints would be more consistent with a fugue [dissociative] state. Dr. Whitehurst did include the Dissociative Experiences Scale during her examination and the claimant did endorse symptoms of this disorder.

(AR 544.)

On December 21, 2009, Dr. Stallings completed a detailed "Psychiatric Assessment" form stating that Plaintiff's primary diagnoses included Dementia and Bipolar I, Mixed. (AR 997–1002.) Dr. Stallings

---

8. As discussed above, the doctors and neuropsychologists erroneously referenced the 2007 MRI as the 2007 CT, thereby causing some amount of confusion in the record. Dr. Murphy incorrectly refers to the CT scan as showing cerebral atrophy when it was the 2007 MRI that indicated the presence of cerebral atrophy, though the CT scan report also references the results of the atrophy identified in the MRI exam as the reason for Dr. Greenfield's ordering the CT scan. Dr. Greenfield specifically ordered the follow-up CT test as a result of the abnormal reading on the MRI to determine if there was any indication of suspected meningiomas. The CT results were then read as "normal" for lack of indication of the suspected meningiomas.

described Plaintiff's medical history as follows:

Patient has been a member of Kaiser Permanente for about 16 years. She was employed by AT & T, then merged with IBM, for more than 20 years total. She was treated here in Behavioral starting in 2004 for depression and anxiety. Patient also had problems with memory and cognition but in general was quite functional when improved. Over time she had increasing memory and cognition problems which resulted in inability to work by 2007. She has also been treated in individual and group psychotherapy with Mark Womack, LCSW and Deborah Scopp, LCSW and has had several courses of intensive outpatient treatment. She has had neuropsychiatric testing which concluded a diagnosis of Dementia (6/10/09). Patient has had extensive impairment in functioning due to these symptoms which have been progressive. Also MRI of brain 7/07 notes "moderate cerebral atrophy". (Family history significant her sister with schizophrenia, father has Alzheimer's, mother possible history of Bipolar disorder).

(AR 998). Dr. Stallings concluded that Plaintiff would never be able to return to work and that vocational rehabilitation was not practical due to the severity of symptoms and impairment and that her "mental problems were secondary to or caused by ... dementia or brain disease." (AR 1000–1001.) On December 31, 2009, after Plaintiff's limited benefits end date had passed, MetLife sent a copy of Dr. Murphy's report to Dr. Stallings and Mark Womack for review and comment.[9] (AR 304–305.)

On January 26, 2010, MetLife sent Plaintiff another letter acknowledging receipt of additional medical information relating to her claim and notifying Plaintiff of its determination to uphold the November 30, 2009 decision to terminate long term disability benefits. (AR 1338–1341.) The January 26, 2010, letter provides:

Based on the review of all clinical information on file, including a file review, a discussion with your neuropsychologist, neuropsychiatric testing, MRI/MRA of the brain reports, psychiatrist and therapist treatment notes for the period August 30, 2007 through November 9, 2009. The diagnosis is bipolar disorder with symptoms of cognitive deficits which are pseudodementia to a mood disorder. The diagnosis of dementia has not been evidenced.

(AR 1338.) The remainder of the letter summarizes the findings of Dr. Murphy's December 14, 2009 report and indicates that because Dr. Stallings and Mr. Womack did not respond and dispute the results of MetLife's file review the claim

9. MetLife's Claim Activity Log reflects an internal debate regarding the propriety of relying on Dr. Murphy's report prior to sending it out for comment and review by Plaintiff's healthcare providers. (AR 303–304.) For example on December 23, 2009, the log states that "[i]f the physician file review indicated that the medical information did not support a psychiatric impairment then a copy of the report would in fact be sent to [employee's] providers." (*Id.*) Later on December 26, 2009, the log reflects a follow-up with the clinical support specialist "for further plan of action as additional info was submitted for review of the exclusion. Although, IPC did clarification, it is ruling out the dementia and organic brain disease. But the final report was not sent to the aps that sent this info for comment. Cm disagrees with pcs and clinical css." (AR 304.) Finally, the log entry from December 28, 2009, indicates that "cm discussed claim with css. css agreed w/cm the IPC addendum needs to be sent to [employee's] ap for comment as the additional medical provided was to be reviewed for the exclusion and the IPC addendum is ruling it out stating it does not support." (*Id.*)

would remain closed. (AR 1340.) MetLife again advised Plaintiff of her right to appeal the determination within 180 days. (*Id.*)

### E. Plaintiff's Appeals

On January 28, 2010, Plaintiff appealed MetLife's November 30, 2009 decision to limit her benefits challenging MetLife's determination that it had not received any medical information to support the presence of organic psychosis or dementia. (AR 562–64.) In her appeal, Plaintiff pointed to the July 12, 2007 MRI showing "moderate to severe cerebral atrophy" and the 2009 Neuropsychological Evaluation performed by Dr. Whitehurst providing an Axis I diagnosis of dementia as evidence in MetLife's possession supporting an extension of benefits beyond the 24 month limitation. (AR 562–563.) In addition, Plaintiff provided the detailed psychiatric questionnaire completed by Dr. Stallings on December 21, 2009. (*Id.*) By letter dated February 1, 2010, Plaintiff indicated her intent to appeal MetLife's January 26, 2010 determination confirming the limitation of benefits. (AR 315.) In conjunction with the appeals, Plaintiff provided a complete set of her medical records from 2001 to 2007. (AR 314–322.)

On February 2, 2010, MetLife reviewed the additional medical records received from Plaintiff's attorney related to the appeal. According to the Activity Log,

> the information provided gives a clearer picture of the history of [employee's] condition(s) and what is going on. However, the information is dated 2001–2007 and offers no new or more current information that evidences an exclusion. There are no other MRIs on file to compare with the 2007. We have the results of all the neuropsych tests. This information does not offer anything new that would cause us to change the previous decision made on the claim.

(AR 316.) On February 15, 2010, in response to Plaintiff's appeal and apparently after making a determination that the additional information made no difference to its decision to terminate benefits, MetLife requested a second IPC review of Plaintiff's file. (AR 554–57.) Carol Walker, Ph.D., an IPC board certified neuropsychologist, provided a report on February 26, 2010. (*Id.*) According to the report, Dr. Walker attempted to reach Dr. Stallings on February 24 and 25, without success. (AR 546.) Dr. Walker summarized some of Plaintiff's medical records and noted that "[f]rom a neuropsychological perspective, according to the medical records reviewed, Ms. Reid's primary diagnosis is bipolar affective disorder" and that "there is no valid or reliable data to support the diagnoses of schizophrenia, dementia, or organic brain disease." (AR 555–556.)

On July 23, 2010, Plaintiff appealed MetLife's January 26, 2010 determination letter, (AR 457–60), and enclosed: (1) a questionnaire signed by Dr. Stallings on the same date (AR 462–65); (2) a copy of Dr. Carstens's September 2004 neuropsychological evaluation (AR 466–70); (3) a chart prepared by Plaintiff and her attorney summarizing Plaintiff's medical records from November 2001 through February 2005 (AR 471–77); and (4) part of a booklet regarding management of dementia (AR 478–505). Plaintiff's attorney also sent an Addendum to the July 23, 2010 appeal letter advising MetLife that Plaintiff had been prescribed Aricept (Donepezil) for the treatment of dementia (for symptoms including mild to moderate confusion, impairment of memory, judgment, and abstract thinking, and changes in personality). (AR 520.)

In the July 23, 2010 questionnaire, Dr. Stallings explained the basis for Plaintiff's

dementia diagnosis and provided comments on the IPC reports of Dr. Murphy and Dr. Walker each concluding that there was no evidence to support dementia. (AR 461–65.) When asked why he believed that Plaintiff suffers from dementia, Dr. Stallings stated:

I have known Ms. Sandra Reid since her first visit with me here at Behavioral health in June 2002. Even in the first several years of treatment, she had frequent complaints of memory and cognitive problems, which in retrospect were probably early signs of dementia. Despite improvement with treatment for depression and probably long standing Attention Deficit Disorder, the memory and cognitive problems persisted. By 2004 a neuropsychological evaluation revealed deficits in these areas, and the possibility of early onset dementia was raised.... Reid continued to work but never regained her previous level of function and continued to experience memory and cognitive impairments. By 2007, she presented with an acute episode of mania and psychosis, which required extensive treatment per stabilization. Despite some improvement, the extent of memory and cognitive concerns led to a second neuropsychological evaluation in 2007, again showing deficits in a number of areas. During the next 2 years of treatment, her degree of impairment worsened and a third neuropsychological evaluation was done in 2009, which showed "severe impairment across domains and tasks in both verbal and visual memory, as well as cognitive processing speed, simple and divided attention, and cognitive flexibility. The results were so profound that the primary diagnosis was now "Dementia". In summary, during the more than 8 years I have known Ms. Reid. I and multiple other mental health clinicians have observed and experienced this decline in her memory and cognition. I believe it is quite possible that in the past her primary diagnosis has been early onset dementia, and the other symptomatology of depression, anxiety and mania were manifestations of this primary dementia disease process. Clearly, this is a very complicated case, but it is evident that despite the exacerbations and improvements of the psychiatric symptoms, the common thread of memory and cognitive decline has persisted.

(AR 464–65.) Dr. Stallings disagreed with Dr. Murphy's statement that Plaintiff's cognitive deficits, unorganized thinking, slow responses and hearing of muffled voices were associated with Bi-polar Disorder. (AR 462.) He reiterated that all of these symptoms can be attributed to Dementia. (*Id.*) In response to whether he believed that Plaintiff exaggerated her functional difficulties on the neuropsychological examination on June 10, 2009 due to her concerns about finances as stated by Dr. Murphy, Dr. Stallings emphatically stated "[a]bsolutely not, the testing results were consistent with the decline in function which had been observed. Note, her excessive spending was a likely result of the diminished judgment and poor impulse control resulting from the cognitive decline." (*Id.*) Dr. Stallings further disagreed with Dr. Murphy's statement that Plaintiff's longstanding memory complaints appear to be due to a pseudo-dementia associated with depression, and explained that "even when the depression improved, the cognitive and memory problems continued. Also the flat affect and personality changes which have occurred may look like depression symptoms, but are instead part of the dementia." (*Id.*) Dr. Stallings agreed with Dr. Murphy that Plaintiff's memory complaints of losing time for 2–3 hours or for half a day are not

suggestive of dementia but that they "are probably dissociative episodes, [and Plaintiff] clearly has both problems, i.e. persistent memory and cognitive impairments, with some intermittent dissociative episodes." (AR 462–63.) Dr. Stallings also disagreed with Dr. Walker's report finding that there was no valid or reliable data to support the diagnosis of dementia because it "contradicts a huge volume of medical records and the results of three neuropsychological evaluations." (AR 463.)

According to the Claim Activity Log, MetLife had received and reviewed Plaintiff's appeal and determined that the "information does not change [sic] initial decision" to terminate benefits. (AR 338.) MetLife acknowledged Plaintiff's appeal on August 2, 2010. (AR 456.) On August 10, 2010, MetLife requested a third IPC review of Plaintiff's medical records. (AR 451–53.) Nick A. DeFillipis, Ph.D., a board certified neuropsychologist and clinical psychologist, provided a report dated August 27, 2010. (AR 405–418.) Once again, MetLife did not request its IPC consultant to conduct an in-person evaluation of Reid. According to his report, Dr. DeFillipis attempted to contact Dr. Stallings on August 17 and 20, but received no response. (AR 415.) Dr. DeFillipis spoke with Plaintiff's former therapist Mark Womack, who stated he had not seen Plaintiff since January and did not have her chart with him to review. (*Id.*) According to Dr. DeFillipis, Mr. Womack, a LCSW, "noted that the claimant had an MRI that said she had some problems[,] had short term memory problems[,] had a diagnosis of bipolar disorder, but was really more depressed than manic[, and] that when he last saw claimant, he felt that she could not work because of a combination of depression and cognitive problems." (AR 415.)

In addition to reviewing Plaintiff's medical records, Dr. DeFillipis considered the prior record reviews of Dr. Murphy and Dr. Walker and the documents provided with Plaintiff's appeal. (AR 410.) In his report, Dr. DeFillipis notes that Plaintiff's medical records and testing were inconsistent with a diagnosis of dementia. (AR 410–13.) Dr. DeFillipis discounts the reliability of Plaintiff's 2004 neuropsychological evaluation because Dr. Carstens did not administer any effort (validity) measures, take a full marital history, record Plaintiff's daily activities, or specify whether visual memory tasks were corrected for poor copy. (AR 410.) However, Dr. DeFillipis states that he thought her problems with attention and processing speed could very well be related to her history of ADHD or emotional problems. (*Id.*) Dr. DeFillipis interpreted Plaintiff's 2007 neuropsychological testing as showing improvement on attention, better verbal comprehension and perceptual organization, and more trouble with working memory and processing speed, which he concludes "is a pattern that would be consistent with an emotional disorder or ADHD." (AR 411.) Thus, according to Dr. DeFillipis, the improvement in cognitive skills from 2004 to 2007 "is certainly inconsistent with the presence of a dementia" and overall the 2007 evaluation "does not indicate evidence of significant cognitive problems" (*Id.*) Third, Dr. DePhillipis found that the 2009 neuropsychological evaluation administered by Dr. Whitehurst contained findings that were inconsistent with dementia, including: (1) "[t]esting indicated a severely impaired drawing of a clock, but then a normal drawing after the examiner demonstrated how to complete the task," which "is not a dementia type of finding, in that demented people would not improve with repeat drawing" (AR 412); (2) Reid "had difficulty learning a word list initially, but delayed recall improved and recognition

accuracy was average," which "is somewhat inconsistent with a dementia profile in that demented individuals would not improve with delay and would not improve with recognition tasks" (*Id.*); (3) Dr. Whitehurst "noted that it was not clear how significant the emotional issues were in determining the cognitive problems, but then diagnosed dementia anyway," which "does not seem to be a reasonable approach to take, in that the clarity of the diagnosis of dementia is not evident" (AR 413); and (4) "the fact that [Reid] did better on repeat testing is inconsistent with the presence of an organically-based dementia...." (*Id.*)

In his conclusion, Dr. DeFillipis reiterates his finding that Plaintiff's complaints of cognitive problem were variably presented in the neuropsychological testing and very inconsistent with a dementia. In addition, Dr. DeFillipis opined that "brain atrophy does not, by itself consistently cause cognitive problems. These would have to be substantiated by a pattern of test results consistent with organic brain impairment. The records are also somewhat unclear as to the extent of the atrophy." (AR 416.) Dr. DeFillipis further commented that Plaintiff's pain medication could also have contributed to the worsening in her scores on the 2009 neuropsychological evaluation. (AR 418.)

On September 1, 2010, MetLife forwarded the report of Dr. DeFillipis to Dr. Stallings and Mr. Womack for review and comment. (AR 404.) MetLife notified Plaintiff's attorney of this by letter dated September 1, 2010. (AR 420.) No responses were received from either provider. (AR 391.)

On October 6, 2010, MetLife contacted Plaintiff's attorney to determine who had prescribed the Aricept as there was no mention of it in any of the medical records in the file. (AR 370–71.) Plaintiff's attorney responded by letter dated October 8, 2010 that Dr. Stallings had prescribed the Aricept and that this information was contained in a letter from Dr. Stallings to MetLife included with Plaintiff's appeal. (AR 1942.) MetLife was unable to locate the purported letter from Dr. Stallings in the file and thus called Dr. Stallings to determine when Aricept was first prescribed to Plaintiff, whether she continued to take it, and what her response to the medication had been. (AR 371–372.) Dr. Stallings informed the MetLife claim representative that Plaintiff began taking Aricept on July 23, 2010, that she had not been prescribed any other medications for dementia prior to that time, and that she had reported some improvement although the purpose of the medication was to halt further decline. (AR 373–76.)

On October 20, 2010, MetLife notified Plaintiff's attorney that the original determination to terminate Plaintiff's long term disability benefits beyond December 21, 2009 had been upheld on appeal. (AR 388–393.) Relying extensively on Dr. DeFilippis's report, MetLife concluded:

Based on our review of the information provided, we determined the medical information provided did not support that Ms. Reid had evidence of an exclusionary diagnosis for a Mental or Nervous Disorder or Disease limited benefit condition as defined by the IBM LTD Plan. You indicated in your appeal letter that Ms. Reid's dementia was evident, and had been diagnosed via neuropsychological evaluations, [MRI] and clinical examinations. The IPC reviewed the entire file, and spoke directly with Ms. Reid's health care provider, Mr. Womack. The IPC concluded that there was no evidence of any of the exclusionary diagnoses, which included schizophrenia, dementia, or organic brain disease for the reasons stated above. Although you in-

dicated that Ms. Reid had been prescribed Aricept, Dr. Stalling advised that Ms. Reid had not been prescribed Aricept until July 23, 2010, and prior to July 23, 2010 no medication specific to treatment for dementia had been provided to Ms. Reid. Although Ms. Reid was prescribed Aricept on July 23, 2010, which is a possible indication of a dementia diagnosis as of that date, for the period of time beyond December 21, 2009 to July 23, 2010, no medications had been prescribed in support of a diagnosis of dementia. In summary, benefits must be administered in accordance with the employer's plan and this requires that Ms. Reid's disability is defined and medically substantiated by her providers with comprehensive and specific information. Based on the medical information available for review and the report from the independent physician consultant, we were unable to conclude that Ms. Reid had evidence of any of the limited benefit condition exclusionary diagnoses for Mental or Nervous Disorder or Disease limited benefit conditions as stated in the Plan. Since there was no evidence of an exclusionary diagnosis, no benefits are payable beyond the limited benefit condition maximum duration date of December 21, 2009. Therefore, we find that the original claim determination was appropriate and Ms. Reid's benefits will remain terminated.

(AR 391–92.) On December 1, 2010, Plaintiff's attorney wrote MetLife a letter with a November 23, 2010 questionnaire from Dr. Stallings, which indicated that bipolar itself could be characterized as a physical illness. (AR 384–385.) MetLife responded by letter dated December 7, 2010, and notified Reid's attorney that the additional questionnaire from Dr. Stallings would not change the previous determination to uphold the decision that Reid's disability was subject to the Limitation Provision. (AR 382.) MetLife further stated: "Our letter dated October 20, 2010 stated that we were upholding our original decision and the reasons for our decision. Our letter also stated that our determination was the final decision on review and constituted completion of a full and fair review required by your Plan and Federal Law." (*Id.*)

### F. Plaintiff's Claim for Social Security Benefits & MetLife's Claim for Back-pay

On March 23, 2010, the Social Security Administration awarded Plaintiff social security disability ("SSD") benefits finding her totally disabled since June 25, 2007 due to Bipolar disorder, and Plaintiff received a retroactive lumpsum award of SSD benefits. (AR 523–530; Suter Aff., ¶ 22.) In response to Plaintiff filing the current lawsuit to reinstate her long term disability benefits, MetLife contends that Plaintiff's SSD award resulted in an overpayment of benefits by MetLife in the amount of $50,166.67 for which Plaintiff has failed to reimburse MetLife under the terms of the Plans. (CounterCl., Doc. 14; Suter Aff. ¶¶ 23–24.) The Plan provides that MetLife has the right to recover any amount it determines to be an overpayment and that Plaintiff has an obligation to reimburse MetLife in the event an overpayment occurs. (AR 44.)

## II. CONCLUSIONS OF LAW

■ ERISA permits a person denied benefits under an employee benefit plan to challenge that denial in federal court. *See* 29 U.S.C. § 1132(a)(1)(B) (2006). In an ERISA benefits denial case the district court acts more as an appellate court than as a trial court. *Curran v. Kemper Nat. Servs., Inc.*, No. 04–14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005). The court "does not take evidence, but,

rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Id.*

Both parties have moved for judgment pursuant to Federal Rule of Civil Procedure 52(a)(1) which provides in relevant part: "[i]n an action tried on the facts without a jury ..., the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Accordingly, the Court bases its Findings of Fact and Conclusions of Law on the administrative record available to the Defendant when it made its final decision to deny benefits.[10] *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir.2008), *reh'g denied* 284 Fed.Appx. 805 (2008), *cert. denied* 555 U.S. 1048, 129 S.Ct. 646, 172 L.Ed.2d 614 (2008) ("When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard[,] the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.") (internal quotations omitted); *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989) (same).

## A. Standard of Review

ERISA itself does not provide a standard for courts reviewing benefits decisions made by plan administrators or fiduciaries. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir.2011), (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)) *cert. denied* — U.S. ——, 132 S.Ct. 849, 181 L.Ed.2d 549 (2011). Based on guidance from the Supreme Court in *Glenn* and *Firestone*, the Eleventh Circuit "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions." *Id.* The steps are:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds

---

**10.** MetLife implied during oral argument that the Court is limited to the information in the record before the plan administrator at the time MetLife made its decision on November 30, 2009 to terminate Plaintiff's benefits as of December 21, 2009 subject to the Limitation Provision. However, the Court notes that MetLife informed Plaintiff that it would consider additional medical information after November 30, 2009 to determine if benefits could be reinstated. Indeed, MetLife made a subsequent "pre-appeal" determination on January 26, 2010, after receiving additional information from Plaintiff and notifying her of its decision to uphold the November 30, 2009 decision. MetLife solicited and received additional medical information, including review by its own IPCs, after November 3, 2009 and during the administrative appeals process, including Dr. DeFillipis's August 27, 2010 report. MetLife notified Plaintiff of its decisions on appeal on October 20, 2010 and December 7, 2010. Indeed, MetLife's decisions rely on evidence it itself secured after November 30, 2009, including the reports of Dr. Murphy and Dr. DeFillipis. Therefore, the Court properly considers only the information contained in the record up to the date of MetLife's final determination on appeal, although the Court also reviews the evidence within the time frame culminating on November 30, 2009.

supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355 (internal citation omitted). The parties agree that the Plans at issue here grant MetLife discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. (*See* Pl.s' Response at 38, Doc. 25–1.)

### B. Burden of Proof

■ A claimant suing under ERISA has the burden of proving entitlement to plan benefits. *Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (internal citation omitted). However, "if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage." *Id.* (internal citation omitted). Plaintiff argues that the Limitation Provision at issue here is a policy exclusion, and thus, the burden shifts to MetLife to prove the applicability of the Limitations Provision as a basis to terminate Plaintiff's long term disability benefits. *See Owens v. Rollins*, No. 1:08–cv–287, 2010 WL 3843765, *2 n. 4 (E.D.Ten. Sept. 27, 2010) (holding that defendant must establish the application of the limitation/exclusion to the plaintiff's claim where defendant did not contest the

plaintiff's assertion that defendant bore the burden of proof in this case because the limitation on benefits for mental and nervous conditions is a coverage exclusion and the plan documents contained no express provision regarding burden of proof). MetLife argues the burden of proof remains with Plaintiff because the Limitation Provision at issue is not an exclusion from benefits, rather it merely limits the amount of benefits that may be received once a claim has been granted. At least one court in this district expressly has adopted MetLife's position. *See Aleksiev v. Metropolitan Life Insurance Co.*, No. 1:10–cv–3322–SCJ (N.D.Ga. Mar. 9, 2012) (finding that in the absence of an Eleventh Circuit case on point that addresses the burden of proof as to the limitation of benefits found in the present plan, plaintiff retains the burden of proof to show she is entitled to receive continued benefits under the long term disability plan). The Court concludes that it need not determine whether Plaintiff or MetLife has the burden of proving whether Plaintiff's disability was subject to the Limitation Provision because it would not materially change the Court's review under the arbitrary and capricious standard for the reasons set forth more fully below. *See Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 83 (1st Cir.2010) (declining to determine which party bore the burden of proof as to the applicability of a mental illness limitation provision because "how the burden is allocated does not much matter unless one or both parties fail to produce evidence, or the evidence presented by the two sides is in 'perfect equipose' ").

### C. *De Novo* Review: Whether MetLife's Decision to Terminate Plaintiff's Continued Benefits After 24 Months Was Wrong

■ As noted above, the first step under the Eleventh Circuit's six-part stan-

dard of review, the Court must conduct a *de novo* review of the plan administrator's decision. To determine under the first step whether the MetLife's decision was "wrong," the Court must examine the terms of the Plan and the administrative record to determine whether the Court agrees with the MetLife's decision. *See Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1138 (11th Cir.2004), *overruled on other grounds by Doyle v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1352 (11th Cir.2008); *HCA Health Servs. of Ga., Inc.,* 240 F.3d 982, 994 n. 23 (11th Cir. 2001) (defining "wrong" as "the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo,* the court disagrees with the claims administrator's plan interpretation"), *overruled on other grounds by Doyle v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1352 (11th Cir.2008). In determining whether MetLife's decision was "wrong," the Court does not give any deference to MetLife's decision. *Williams,* 373 F.3d at 1137. The Court must instead "stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." *Stiltz v. Metropolitan Life Ins. Co.,* No. 1:05–CV3052–TWT, 2006 WL 2534406, at *6 (N.D.Ga. Aug. 30, 2006), *aff'd,* 244 Fed.Appx. 260 (11th Cir.2007); *see also Hanna v. WCI Cmts., Inc.,* 348 F.Supp.2d 1322, 1329 (S.D.Fla.2004). "*De novo* review essentially requires the Court to act as an insurance adjuster and substitute its judgment for the judgment of the claims administrator." *Kinser v. Plans Admin. Committee of Citigroup, Inc.,* 488 F.Supp.2d 1369, 1379 (M.D.Ga.2007). "At this stage, the Court is essentially acting as a fact finder, reviewing the evidence and making a determination on its own as to whether or not Plaintiff is entitled to disability benefits." *Bates v. Metropolitan Life Ins. Co.,* No. 5:08–CV–22 (CAR), 2009 WL 2355834, at *10 (M.D.Ga. July 27, 2009).

■ The question before the Court is whether MetLife's determination that there was no evidence of any of the exclusionary diagnoses of schizophrenia, dementia, or organic brain disease (that would have entitled Plaintiff to continued long term benefits) was incorrect. As noted above, the Plans limit long term disability benefits for a disability "due to a mental or nervous disease or disorder" to 24 months unless the disability "result[s] from schizophrenia, dementia or organic brain disease." (AR 39, AR 77, AR 81.) For definitions of mental or nervous disorders and diseases, the Plans refer to the most recent edition of the American Psychiatry Association's Diagnostic And Statistical Manual Of Mental Disorders ("DMS–IV–TR").

1. Relevant portions and excerpts of the Diagnostic And Statistical Manual Of Mental Disorders ("DSM–IV–TR")

For the most part, the Court will quote directly from the Diagnostic And Statistical Manual Of Mental Disorders rather than risk erroneously paraphrasing these complex medical diagnostic terms and criteria. According to the American Psychiatry Association,

the term *mental disorder* unfortunately implies a distinction between "mental" disorders and "physical" disorders that is a reductionistic anachronism of mind/body dualism. A compelling literature documents that there is much "physical" in "mental" disorders and much "mental" in "physical" disorders. The problem raised by the term "mental" disorders has been much clearer than its solution, and, unfortunately, the term persists in the title of DSM–IV because we have not found an appropri-

ate substitute. Moreover, although this manual provides a classification of mental disorders, it must be admitted that no definition adequately specifies precise boundaries for the concept of "mental disorder."

The concept of mental disorder, like many other concepts in medicine and science, lacks a consistent operational definition that covers all situations. All medical conditions are defined on various levels of abstraction—for example, structural pathology (e.g., ulcerative colitis), symptom presentation (e.g., migraine), deviance from a physiological norm (e.g., hypertension), and etiology (e.g., pneumococcal pneumonia). Mental disorders have also been defined by a variety of concepts (e.g., distress, dysfunction, dyscontrol, disadvantage, disability, inflexibility, irrationality, syndromal pattern, etiology, and statistical deviation). Each is a useful indicator for a mental disorder, but none is equivalent to the concept, and different situations call for different definitions.

DSM–IV–TR, Definition of Mental Disorder, at xxx (4th ed. 2000).

The American Psychiatry Association acknowledges there are "issues in the use of DMS–IV" and discusses "limitations of the categorical approach" as follows:

In DSM–IV, there is no assumption that each category of mental disorder is a completely discrete entity with absolute boundaries dividing it from other mental disorders or from no mental disorder. There is also no assumption that all individuals described as having the same mental disorder are alike in all important ways. The clinician using DSM–IV should therefore consider that individuals sharing a diagnosis are likely to be heterogeneous even in regard to the defining features of the diagnosis and that boundary cases will be difficult to diag-

nose in any but a probabilistic fashion. This outlook allows greater flexibility in the use of the system, encourages more specific attention to boundary cases, and emphasizes the need to capture additional clinical information that goes beyond diagnosis. In recognition of the heterogeneity of clinical presentations, DSM–IV often includes polythetic criteria sets, in which the individual need only present with a subset of items from a longer list (e.g., the diagnosis of Borderline Personality Disorder requires only five out of nine items).

DSM–IV–TR, Issues in the Use of DSM–IV, at xxxi. The DSM–IV–TR also discusses the importance of the use of clinical judgment in referencing the DSMIV–TR as a tool for classification of mental disorders:

The diagnostic categories, criteria, and textual descriptions are meant to be employed by individuals with appropriate clinical training and experience in diagnosis. It is important that DSM–IV not be applied mechanically by untrained individuals. The specific diagnostic criteria included in DSM–IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion. For example, the exercise of clinical judgment may justify giving a certain diagnosis to an individual even though the clinical presentation falls just short of meeting the full criteria for the diagnosis as long as the symptoms that are present are persistent and severe. On the other hand, lack of familiarity with DSM–IV or excessively flexible and idiosyncratic application of DSMIV criteria or conventions substantially reduces its utility as a common language for communication.

In addition to the need for clinical training and judgment, the method of data

collection is also important. The valid application of the diagnostic criteria included in this manual necessitates an evaluation that directly accesses the information contained in the criteria sets (e.g., whether a syndrome has persisted for a minimum period of time). Assessments that rely solely on psychological testing not covering the criteria content (e.g., projective testing) cannot be validly used as the primary source of diagnostic information.

DSM–IV–TR, Issues in the Use of DSM–IV, at xxxii. Finally, the DSM–IV–TR discusses limitations in the use of the DSM–IV–TR in forensic settings, stating:

> When the DSM–IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM–IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM–IV diagnosis. This might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

Nonclinical decision makers should also be cautioned that a diagnosis does not carry any necessary implications regarding the causes of the individual's mental disorder or its associated impairments. Inclusion of a disorder in the Classification (as in medicine generally) does not require that there be knowledge about its etiology. Moreover, the fact that an individual's presentation meets the criteria for a DSM–IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time.

> It must be noted that DSM–IV reflects a consensus about the classification and diagnosis of mental disorders derived at the time of its initial publication. New knowledge generated by research or clinical experience will undoubtedly lead to an increased understanding of the disorders included in DSM–IV, to the identification of new disorders, and to the removal of some disorders in future classifications. The text and criteria sets included in DSM–IV will require reconsideration in light of evolving new information.

DSM–IV–TR, Issues in the Use of DSM–IV, at xxxii-xxxiii. For these reasons, the American Psychiatry Association provides as a cautionary statement regarding the DSM–IV–TR that, "the clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as . . . disability determination." DSM–IV–TR, Cautionary Statement, at xxxvii.

Chapter 2 of the DSM–IV–TR classifies delirium, dementia, and amnestic and other cognitive disorders together as disorders where the "predominant disturbance is a clinically significant deficit in cognition that represents a significant change from a previous level of functioning." DSM–IV–TR, Delirium, Dementia, and Amnestic and Other Cognitive Disorders, at 135. For each of these disorders "the etiology is either a general medical condition (although the specific general medical condition may not be identifiable) or a substance (i.e., a drug of abuse, medication, or toxin), or a combination of these factors." *Id.* In addressing the historical classification of these disorders, the DSM–IV–TR provides:

> In DSM–III–R, these disorders were placed in a section titled "Organic Mental Syndromes and Disorders." The term organic mental disorder is no longer used in DSM–IV because it incorrectly implies that "nonorganic" mental disorders do not have a biological basis. In DSM–IV, disorders formerly called "organic mental disorders" have been grouped into three sections: 1) Delirium, Dementia, and Amnestic and Other Cognitive Disorders;[11] 2) Mental Disorders Due to a General Medical Condition; and 3) Substance–Related Disorders.

*Id.*

The various classifications of Dementia "are characterized by the development of multiple cognitive deficits (including memory impairment) that are due to the direct physiological effects of a general medical condition, to the persisting effects of a substance, or to multiple etiologies (e.g., the combined effects of cerebrovascular disease and Alzheimer's disease)." DSM–IV–TR, Dementia, at 147. All types of Dementia share a common symptom presentation but are differentiated based on etiology. *Id.* The diagnostic features of Dementia include the following:

> The essential feature of a dementia is the development of multiple cognitive deficits that include memory impairment and at least one of the following cognitive disturbances: aphasia,[12] apraxia,[13] agnosia,[14] or a disturbance in executive functioning.[15] The cognitive deficits must be sufficiently severe to cause impairment in occupational or social functioning and must represent a decline from a previously higher level of functioning.[16]

11. Cognitive Disorder Not Otherwise Specified is for presentations that are characterized by *cognitive dysfunction presumed to be due* to either a general medical condition or substance use that do not meet criteria for any of the disorders listed elsewhere in this section. DSM–IV–TR, Delirium, Dementia, and Amnestic and Other Cognitive Disorders, at 136.

12. Aphasia is the deterioration of language function. DSM–IV–TR, Dementia, at 148.

13. Apraxia is the impaired ability to execute *motor activities despite intact motor abilities,* sensory function, and comprehension of the required task. DSM–IV–TR, Dementia, at 149.

14. Agnosia is the failure to recognize or identify objects despite intact sensory function. DSM–IVTR, Dementia, at 149.

15. Executive functioning involves the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. DSM–IV–TR, Dementia, at 149.

16. A diagnosis of a dementia should not be made if the cognitive deficits occur exclusively during the course of a delirium. DSM–IV–TR, Dementia, at 148. A delirium is characterized by a disturbance of consciousness and a change in cognition that develop over a short period of time and is often associated with a disturbance in the sleep-wake cycle. DSM–IV–TR, Delirium, Dementia, and Amnestic and Other Cognitive Disorders, at 135,

. . .

Memory impairment is required to make the diagnosis of a dementia and is a prominent early symptom (Criterion A1). Individuals with dementia become impaired in their ability to learn new material, or they forget previously learned material. Most individuals with dementia have both forms of memory impairment, although it is sometimes difficult to demonstrate the loss of previously learned material early in the course of the disorder. They may lose valuables like wallets and keys, forget food cooking on the stove, and become lost in unfamiliar neighborhoods. In advanced stages of dementia, memory impairment is so severe that the person forgets his or her occupation, schooling, birthday, family members, and sometimes even name.

Memory may be formally tested by asking the person to register, retain, recall, and recognize information. The ability to learn new information may be assessed by asking the individual to learn a list of words. The individual is requested to repeat the words (registration), to recall the information after a delay of several minutes (retention, recall), and to recognize the words from a multiple list (recognition). Individuals with difficulty learning new information are not helped by clues or prompts (e.g., multiple-choice questions) because they did not learn the material initially. In contrast, individuals with primarily retrieval deficits can be helped by clues and prompts because their impairment is in the ability to access their memories. Remote memory may be tested by asking the individual to recall personal information or past material that the individual found of interest (e.g., politics, sports, entertainment). It is also useful to determine (from the individual and informants) the impact of the memory disturbances on the individual's functioning (e.g., ability to work, shop, cook, pay bills, return home without getting lost). Deterioration of language function (aphasia) may be manifested by difficulty producing the names of individuals and objects (Criterion A2a). The speech of individuals with aphasia may become vague or empty, with long circumlocutory phrases and excessive use of terms of indefinite reference such as "thing" and "it." Comprehension of spoken and written language and repetition of language may also be compromised. In the advanced stages of dementia, individuals may be mute or have a deteriorated speech pattern characterized by echolalia (i.e., echoing what is heard) or palilalia (i.e., repeating sounds or words over and over). Language is tested by asking the individual to name objects in the room (e.g., tie, dress, desk, lamp) or body parts (e.g., nose, chin, shoulder), follow commands ("Point at the door and then at the table"), or repeat phrases ("no ifs, ands, or buts").

Individuals with dementia may exhibit apraxia (i.e., impaired ability to execute motor activities despite intact motor abilities, sensory function, and comprehension of the required task) (Criterion A2b). They will be impaired in their ability to pantomime the use of objects (e.g., combing hair) or to execute known motor acts (e.g., waving goodbye). Apraxia may contribute to deficits in cooking, dressing, and drawing. Motor skill disturbances may be tested by asking the individual to execute motor functions (e.g., to show how to brush teeth, to copy intersecting pentagons, to assemble blocks, or to arrange sticks in specific designs).

137. However, a dementia and a delirium may both be diagnosed if the dementia is present at times when the delirium is not present. *Id.* at 148.

Individuals with dementia may exhibit agnosia (i.e., failure to recognize or identify objects despite intact sensory function) (Criterion A2c). For example, the individual may have normal visual acuity but lose the ability to recognize objects such as chairs or pencils. Eventually they may be unable to recognize family members or even their own reflection in the mirror. Similarly, they may have normal tactile sensation, but be unable to identify objects placed in their hands by touch alone (e.g., a coin or keys).

Disturbances in executive functioning are a common manifestation of dementia (Criterion A2d) and may be related especially to disorders of the frontal lobe [17] or associated subcortical pathways. Executive functioning involves the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. Impairment in abstract thinking may be manifested by the individual having difficulty coping with novel tasks and avoiding situations that require the processing of new and complex information. The ability to abstract can be formally assessed by asking the person to find similarities or differences between related words. Executive dysfunction is also evident in a reduced ability to shift mental sets, to generate novel verbal or nonverbal information, and to execute serial motor activities. Tests for executive function include asking the individual to count to 10, recite the alphabet, subtract serial 7s, state as many animals as possible in 1 minute, or draw a continuous line consisting of alternating m's and n's. It is also useful to determine (from the individual and informants) the impact of the disturbances in executive functioning on the individual's daily life (e.g., ability to work, plan activities, budget).

**17.** The DSM–TR–IV discusses frontotemporal dementia only in the specific context of Pick's Disease:

> Pick's disease is a degenerative disease of the brain that particularly affects the frontal and temporal lobes. As in other frontal lobe dementias, Pick's disease is characterized clinically by changes in personality early in the course, deterioration of social skills, emotional blunting, behavioral disinhibition, and prominent language abnormalities. Difficulties with memory, apraxia, and other features of dementia usually follow later in the course. Prominent primitive reflexes (snout, suck, grasp) may be present. As the dementia progresses, it may be accompanied by either apathy or extreme agitation. Individuals may develop such severe problems in language, attention, or behavior that it may be difficult to assess their degree of cognitive impairment. Structural brain imaging typically reveals prominent frontal and/or temporal atrophy, and functional brain imaging may localize frontotemporal hypometabolism, even in the absence of clear structural atrophy. The disorder most commonly manifests itself in individuals between ages 50 and 60 years, although it can occur among older individuals. Pick's disease is one of the pathologically distinct etiologies among the heterogeneous group of dementing processes that are associated with frontotemporal brain atrophy. The specific diagnosis of a frontal lobe dementia such as Pick's disease is usually established at autopsy with the pathological finding of characteristic intraneuronal argentophilic Pick inclusion bodies. Clinically, Pick's disease often cannot be distinguished with certainty from atypical cases of Alzheimer's disease or from other dementias that affect the frontal lobes.

DSM–IV–TR, Dementia, at 165. The DSM–IV–TR provides that "Dementia due to frontotemporal degeneration other than Pick's disease should be diagnosed as Dementia Due to Frontotemporal Degeneration, one of the dementias due to other general medical conditions (see 294.1x Dementia Due to Other General Medical Conditions)." Id. However, the section of the DSMIV–TR dealing with Dementia Due to Other General Medical Conditions states that "dementia due to frontotemporal degeneration other than Pick's disease require further research." Id. at 167.

The items in both Criterion A1 (memory impairment) and Criterion A2 (aphasia, apraxia, agnosia, or disturbance in executive functioning) must be severe enough to cause significant impairment in social or occupational functioning (e.g., going to school, working, shopping, dressing, bathing, handling finances, and other activities of daily living) and must represent a decline from a previous level of functioning (Criterion B). The nature and degree of impairment are variable and often depend on the particular social setting of the individual. The same level of cognitive impairment may significantly impair an individual's ability to perform a complex job, but not a job that is less demanding. Standardized published rating scales that measure physical maintenance (e.g., personal hygiene), intellectual functioning, and the ability to use implements or tools (e.g., telephone, washing machine) can be used to measure the severity of impairment.

DSM–IV–TR, Dementia, at 148–149.

In addition to the diagnostic features, Dementia is accompanied by numerous associated features:

Individuals with dementia may become spatially disoriented and have difficulty with spatial tasks. Visuospatial functioning can be assessed by asking the individual to copy drawings, such as a circle.... Poor judgment and poor insight are common in dementia. Individuals may exhibit little or no awareness of memory loss or other cognitive abnormalities.... They may underestimate the risks involved in activities (e.g., driving).... Dementia is sometimes accompanied by motor disturbances of gait leading to falls. Some individuals with dementia show disinhibited behavior, including ... neglecting personal hygiene ... or disregarding conventional rules of social conduct ... The multiple cogni-

tive impairments of dementia are often associated with anxiety, mood, and sleep disturbances. Delusions are common, especially those involving themes of persecution (e.g., that misplaced possessions have been stolen). Hallucinations can occur in all sensory modalities, but visual hallucinations are most common ... Individuals with dementia may be especially vulnerable to physical stressors (e.g., illness or minor surgery) and psychosocial stressors (e.g., going to the hospital, bereavement), which may exacerbate their intellectual deficits and other associated problems.

DSM–IV–TR, Dementia, at 150. The abnormalities in cognitive and memory functioning that occur with Dementia can be assessed using mental status examinations and neuropsychological testing, and neuroimaging may aid in the differential diagnosis of dementia. DSM–IV–TR, Dementia, at 150. For example, computed tomography (CT) and magnetic resonance imaging (MRI) may reveal cerebral atrophy as an indicator of Dementia. *Id.*

2. Diagnostic support for Cognitive Disorder and Dementia in Plaintiff's medical records

Plaintiff contends that MetLife's decision to terminate benefits based on the mental/nervous Limitation Provision in the Plans was wrong because she has presented "overwhelming medical evidence in the form of a MRI showing moderate to severe cerebral atrophy, years of medical records reflecting cognitive problems, the findings of three neuropsychological evaluations and the opinions of her treating physician, Dr. Stallings and her examiner, Dr. Whitehurst" to substantiate her disability resulted from dementia. (Doc. 25–1 at 40.) Plaintiff further contends that "[i]t is not surprising that Reid's care givers mistook her dementia for other illnesses,"

initially such as bipolar disorder, depression and ADHD. (*Id.*)

MetLife argues that its decision was correct for the following reasons:

> The preponderance of the medical records and statements from Reid's providers in the administrative record support the evident conclusion that Reid's disability was caused by bipolar disorder. Although Dr. Whitehead [sic] diagnosed dementia after Reid's latest neuropsychological testing, two other neuropsychologists disagreed that the testing was consistent with that diagnosis. No other clinical evidence of dementia could be located in the medical documentation submitted by Reid and her attorney in support of her claim, and the statements by Dr. Stallings regarding dementia were equivocal.

(Doc. 24–1 at 39–40.) MetLife further contends that although the record included reports of a brain scan showing cerebral atrophy, the record demonstrates that the documentation in MetLife's possession at the time of its claims decision in December 2009 did not include any mention of cerebral atrophy in the CT scan report. MetLife cites to AR 1424–36 which is a report summarizing the findings of Plaintiff's brain imaging reports, including the 2008 scans of the pituitary gland and brain stem. Pages 1434 through 1435 of the record are the July 13, 2007 report results sheets of a CT scan performed at that time, that state "What is the reason for this exam? Dr. Greenfield suggested because of abnormality on MRI to rule out meningioma." (AR 1434–1435.) In turn, Dr. Greenfield's report on the MRI results showing cerebral atrophy was completed one day earlier, on July 12, 2007. According to MetLife, the 2007 MRI results showing cerebral atrophy were only received on February 2, 2010, after MetLife's benefits determination in conjunction with Plaintiff's appeal. (*See* Doc. 29 at 4 (citing AR 683).) Even assuming MetLife did not receive the actual 2007 MRI report until February 2010, as it argues, or itself consider obtaining the specific MRI report referenced in Dr. Greenfield's CT report of July 13, 2007, the record shows that MetLife ultimately considered the report and rejected its significance with respect to Plaintiff's diagnosis. MetLife's Claim Activity Log demonstrates that MetLife acknowledged that in the event MetLife received the additional supporting medical information after its claims determination, including Plaintiff's 2007 imaging report and 2004 neuropsychological evaluation, such information would be reviewed to see if benefits could be extended beyond the limited disability benefits end date. (AR 286–87.) Indeed, on November 30, 2009, MetLife again notified Plaintiff of its determination that her benefits were subject to the Limitation Provision for mental and nervous disorders, and advised her that it would consider additional medical records, including test results submitted on appeal. (AR 1979–1980.)

Moreover, MetLife's Claim Activity Log reflects that its IPC, Dr. Murphy, discussed the results of Plaintiff's 2007 MRI with Plaintiff's treating neuropsychologist on November 9, 2009, prior to MetLife's claim determination. (AR 277–78.) Based on Dr. Murphy's conversation with Dr. Whitehurst and a review of her 2009 neuropsychological evaluation, Dr. Murphy conceded to MetLife (although not included in the December 14, 2009 report) that an abnormal scan demonstrating significant atrophy combined with the other evidence in Plaintiff's medical records would be enough to demonstrate a diagnosis of dementia. (AR 279–80.)

In order to continue benefits after 24 months under the language of the Plans,

there must evidence that Plaintiff's disability resulted from schizophrenia, dementia, or organic brain disease. The Court finds that there is evidence in the record to support Plaintiff's diagnosis of dementia as set forth below.[18] As early as 2004, Plaintiff's medical records mention that her cognitive and behavioral symptoms may have been attributable to Dementia. In conjunction with the 2004 neuropsychological evaluation, Dr. Carstens noted that Plaintiff had "clear problems with working memory, disorganization of speech not easily explained by depression or ADD" and that there was a concern of early onset Alzheimer's (AR 776, AR 470.) In the 2007 neuropsychological evaluation, as a result of additional decline in her working memory and processing speed and considering "her CT showing moderate to severe cerebral atrophy," Dr. Carstens noted that Plaintiff was "still showing signs of cognitive disorder which has not clearly worsened, but the question of etiology (bipolar disorder [19] vs. early dementia) remain[ed]." (AR 1655.) By 2009, it became evident to Plaintiff's treating physicians that she was suffering from chronic dementia and that the onset was gradual. (AR 1448–57, AR 997–1002, AR 1003–07, AR 1011.) Dr. Whitehurst's June/September 2009 neuropsychological evaluation stated that "the primary diagnosis based on test profile is dementia with the flavor of fronto-temporal dementia with regards to patient's and friend's emphasis on 'flat affect.' " (AR 1456.)

Plaintiff's treating psychiatrist, Dr. Stallings agreed with Dr. Whitehurst's findings in November 2009. (AR 1011.) Moreover, Dr. Stallings's December 21, 2009 "Psychiatric Assessment" identifying a primary diagnosis of dementia described Plaintiff's medical history and evolving diagnosis as follows:

Patient has been a member of Kaiser Permanente for about 16 years. She was employed by AT & T, then merged with IBM, for more than 20 years total. She was treated here in Behavioral starting in 2004 for depression and anxiety. Patient also had problems with memory and cognition but in general was quite functional when improved. Over time she had increasing memory and cognition problems which resulted in inability to work by 2007. She has also been treated in individual and group psychotherapy with Mark Womack, LCSW and Deborah Scopp, LCSW and has had several courses of intensive outpatient treatment. She has had neuropsychiatric testing which concluded a diagnosis of Dementia (6/10/09). Patient has had extensive impairment in functioning due to these symptoms which have been progressive. Also MRI of brain 7/07 notes "moderate cerebral atrophy". (Family history significant

---

18. Although Plaintiff does not expressly argue that Plaintiff would be entitled to continued benefits based on her Cognitive Disorder diagnosis, the Court finds sufficient evidence in the record to support such a diagnoses and notes that MetLife treated Plaintiff's cognitive disorder as a covered "organic psychosis" which is consistent with the DSM–IV–TR's treatment of cognitive disorder as an organic brain disorder. See DSM–IV–TR at 135.

19. Bipolar I Disorder is characterized by one or more Manic or Mixed Episodes, usually accompanied by Major Depressive Episodes.

DSM–IV–TR, Mood Disorders, at 345. Major Depressive Episodes are shown by at least 2 weeks of depressed mood or loss of interest accompanied by at least four additional symptoms of depression). Id. "Bipolar disorder is diagnosed and treated based on the patient's self-reported symptoms. There are no x-rays, CT scans, MRIs, blood tests, or machines to measure or 'objectively' prove bipolar disorder." Kinser v. Plans Admin. Committee of Citigroup, Inc., 488 F.Supp.2d 1369 (M.D.Ga. 2007); accord DSM–IV–TR, Mood Disorders, at 345–388.

her sister with schizophrenia, father has Alzheimer's, mother possible history of Bipolar disorder).

(AR 998.) Finally, on July 23, 2010, Dr. Stallings completed a lengthy questionnaire for Plaintiff that was submitted to MetLife during Plaintiff's appeals process. (AR462–465.) In support of his diagnosis of dementia, Dr. Stallings states:

I have known Ms. Sandra Reid since her first visit with me here at Behavioral health in June 2002. Even in the first several years of treatment, she had frequent complaints of memory and cognitive problems, which in retrospect were probably early signs of dementia. Despite improvement with treatment for depression and probably long standing Attention Deficit Disorder, the memory and cognitive problems persisted. By 2004 a neuropsychological evaluation revealed deficits in these areas, and the possibility of early onset dementia was raised. . . . Reid continued to work but never regained her previous level of function and continued to experience memory and cognitive impairments. By 2007, she presented with an acute episode of mania and psychosis, which required extensive treatment per stabilization. Despite some improvement, the extent of memory and cognitive concerns led to a second neuropsychological evaluation in 2007, again showing deficits in a number of areas. During the next 2 years of treatment, her degree of impairment worsened and a third neuropsychological evaluation was done in 2009, which showed "severe impairment across domains and tasks in both verbal and visual memory, as well as cognitive processing speed, simple and divided attention, and cognitive flexibility. The results were so profound that the primary diagnosis was now "Dementia". In summary, during the more than 8 years I have known Ms. Reid. I and multiple other mental health clinicians have observed and experienced this decline in her memory and cognition. I believe it is quite possible that in the past her primary diagnosis has been early onset dementia, and the other symptomatology of depression, anxiety and mania were manifestations of this primary dementia disease process. Clearly, this is a very complicated case, but it is evident that despite the exacerbations and improvements of the psychiatric symptoms, the common thread of memory and cognitive decline has persisted.

(AR 464–65.) The Court cannot ignore the abundant medical records documenting Plaintiff's symptoms that are clearly consistent with Dementia as it is classified and discussed in the DSM–IV–TR, the recognized authority under the MetLife Plans for the diagnosis of psychiatric disorders.

The Court does not agree with MetLife's assertion that Dr. Stallings was equivocal in his diagnosis. After describing Plaintiff's cognitive decline and increasing impairment from 2004 to 2009, Dr. Stallings emphatically concludes "The results [of the third neuropsychological evaluation] were so profound that the primary diagnosis was now 'Dementia'." (*Id.*) As the DSM–IV–TR recognizes, a proper diagnosis of a patient suffering from symptoms of multiple disorders is not always clear cut. The DSM–IV–TR addresses primary diagnoses and dual/comorbid diagnoses as follows:

When more than one diagnosis for an individual is given in an inpatient setting, the principal diagnosis is the condition established after study to be chiefly responsible for occasioning the admission of the individual. . . . In most cases, the principal diagnosis or the reason for visit is also the main focus of attention or treatment. It is often difficult (and somewhat arbitrary) to determine which

diagnosis is the principal diagnosis or the reason for visit, especially in situations of "dual diagnosis."

DSM–IV–TR, Use of Manual, at 3. For example, it may be unclear which diagnosis should be considered "principal" for an individual suffering from more than one disease or disorder where each condition may have contributed equally to the need for admission and treatment. *Id.* As Plaintiff's own doctors recognized and the DSM–IV–TR points out, Major Depressive Disorder may be associated with complaints of memory impairment, difficulty thinking and concentrating, and an overall reduction in intellectual abilities and individuals suffering from severe depression sometimes perform poorly on mental status examinations and neuropsychological testing. DSM–IV–TR, Dementia, at 153. The DSM–IV–TR further provides that

> it is often difficult to determine whether cognitive symptoms are better accounted for by a dementia or by a Major Depressive Episode. This differential diagnosis may be informed by a thorough medical evaluation and an evaluation of the onset of the disturbance, the temporal sequencing of depressive and cognitive symptoms, the course of illness, family history, and treatment response. The premorbid state of the individual may help to differentiate "pseudodementia" (i.e., cognitive impairments due to the Major Depressive Episode) from dementia. In dementia, there is usually a premorbid history of declining cognitive function, whereas the individual with a Major Depressive Episode is much more likely to have a relatively normal premor-

bid state and abrupt cognitive decline associated with the depression. If the clinician determines that both a dementia and Major Depressive Disorder are present with independent etiologies, both should be diagnosed.

*Id.*

Accordingly, it appears to the Court that Dr. Stallings admitted that Plaintiff had been originally misdiagnosed, that "in retrospect [her earlier symptoms] were probably early signs of dementia," and that it was "quite possible" that her primary diagnosis should have been early onset dementia all along[20]. (AR 464.) The evidence indicates that Plaintiff was disabled due to comorbid diagnoses of bipolar disorder, cognitive disorder, and dementia, information which was available to MetLife at the time it made its determination to terminate benefits under the Limitation Provision. MetLife's own Claim Activity Log acknowledges the existence of comorbid diagnoses. (AR 147, 217.) However, without any explanation, MetLife subsequently took the position that no comorbid diagnoses were indicated and that Plaintiff's medical records "continue[d] to support from a psych standpoint" only. (AR 254.) However, the record is inadequate to support MetLife's rejection of a comorbid diagnosis in favor of finding Plaintiff was disabled solely due to her bipolar disorder that was in partial remission at the time she was diagnosed as having dementia.

The Court finds Dr. Stallings' opinions, based on an eight-year treating relationship with Plaintiff and his consideration of Dr. Whitehurst and Dr. Carstens's reports, the MRI results, and repeated neuropsychological testing results to be far

---

**20.** This diagnosis is consistent with the DSM–IV–TR's recognition that certain conditions may be subject to misdiagnosis in borderline cases and cautions that "[t]he clinician ... should therefore consider that individuals sharing a diagnosis are likely to be heteroge-

neous even in regard to the defining features of the diagnosis and that boundary cases will be difficult to diagnose in any but a probabilistic fashion." DSM–IV–TR, Issues in the Use of DMS–IV, at xxxi.

more reliable than the opinions of Met-Life's three IPC's whose opinions were each based on a single file review. *See Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1198 (11th Cir.2007) (holding that defendant's denial of employee's claim for failure to provide objective evidence was arbitrary and capricious because "it was based on a mischaracterization of the evidence" employee submitted); *Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006) (under arbitrary-or-capricious standard, where credibility determination was key component of assessing disability, reliance solely on file review, without an independent examination, was inadequate); *Kinser*, 488 F.Supp.2d 1369, 1382; *Sheehan v. Metropolitan Life Ins. Co.*, 368 F.Supp.2d 228 (S.D.N.Y.2005) (noting that a psychiatrist evaluating a patient's mental health relies heavily on their ability to observe the patient's mannerisms, demeanor, and expressions and therefore inherently involves credibility determinations); *Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed.Appx. 495, 508 (6th Cir. 2008) (holding under arbitrary and capricious standard that Sheehan highlights the inadequacy of record review when determining benefits for someone claiming a mental disability as an examination could have helped the plan administrator to better evaluate the severity of plaintiff's symptoms).

Having concluded that MetLife's decision to terminate benefits after 24 months for lack of evidence of the exclusionary diagnoses of dementia was "wrong" pursuant to a de novo review, the Court must now determine whether, despite being "wrong," the decision was reasonable.

### D. Arbitrary and Capricious Standard: Whether "Reasonable" Grounds Support MetLife's Determination

■ Even if the Court disagrees with MetLife's determination from a *de novo*

perspective, it must still be upheld if supported by any 'reasonable' grounds in the administrative record. *Williams v. Bell-South Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir.2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir.2008); *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378–79 (6th Cir.2005) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000)). The standard for whether the determination was arbitrary and capricious is not the preponderance standard, but whether it was the product of a deliberate, principled reasoning process and supported by substantial evidence. *See Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir.2006), *aff'd Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance." *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir.2003); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995); *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir.1992). Although review pursuant to the arbitrary and capricious standard is thus extremely deferential, "[i]t is not, however, without some teeth. Deferential review is not no review, and deference need not be abject." *Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed. Appx. 495, 504 (6th Cir.2008); *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d at 172. It "does not require [the court] merely to rubber stamp the administrator's decision. Instead, [the court is] required to review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Smith v.*

*Bayer Corp. Long Term Disability Plan,* 275 Fed.Appx. at 504; *Glenn v. MetLife,* 461 F.3d at 666, *aff'd Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). If the administrative record does not show that the administrator offered a "reasoned explanation" based on substantial evidence, the decision is arbitrary or capricious. *Moon,* 405 F.3d at 379.

▮ Plaintiff contends that the file as a whole demonstrates that MetLife's decision was unreasonable. (Doc. 25–1 at 42.) Specifically, Plaintiff challenges MetLife's reliance on the file review of three Independent Physician Consultants to support its decision to terminate benefits after 24 months under the Limitation Provision. (*Id.* at 43.) MetLife contends its decision was not unreasonable or an abuse of discretion because

> MetLife conducted a thorough review of Reid's claims and credited ample evidence in the administrative record, including years of office and therapy notes attributing disability to bipolar disorder, multiple statements from Reid's providers that her primary disabling diagnosis was bipolar disorder, and the opinions of three independent consultants who opined that Reid was disabled by bipolar disorder and that her testing was inconsistent with dementia.

(Doc. 29 at 14.)

After reviewing both "the quality and quantity of the medical evidence and the opinions on both sides of the issues," the Court finds MetLife's reliance on the file review Plaintiff's medical records performed by its three Independent Physician Consultants unreasonable.[21] *Glenn,* 461 F.3d at 666. Dr. Murphy, Ph.D., the first IPC to review Plaintiff's file in December 2009, noted that "[t]he results of a single neuropsychological examination are difficult to use in determining whether areas of cognitive difficulty are attributable to Bipolar Disorder or represent the early signs of dementia" and that "repeated neuropsychological assessment is the best method for documenting a progressive decline in cognition that would be found in a condition such as dementia." (AR 544.) Indeed, Plaintiff underwent a total of three neuropsychological evaluations over the course of five years. While Plaintiff showed some minimal improvement in some areas between the 2004 and 2007, her scores "certainly suggest[ed] some decline in working memory and processing speed relative to previous functioning, based on her achievement testing and occupational attainment." (AR 1654.) Most notably, however, during the 2009 neuropsychological evaluation "testing revealed severe impairment across domains and tasks in both verbal and visual memory, as well as cognitive processing speed, simple and divided attention and cognitive flexibility." (AR 1456.)

However, without pointing to any medical authority on Dementia diagnostic criteria, Dr. Murphy discounted the findings of

---

21. The report of Dr. Walker, the second IPC to review Plaintiff's file, merits little discussion here. Other than rejecting the validity of Plaintiff's neuropsychological evaluations for lack of "measures," her report offers nothing more in support of her conclusion that Plaintiff's disability was due to Bipolar Disorder as opposed to an early onset of Dementia. Furthermore, Dr. Walker appears to discount medical records that support a Dementia diagnosis and highlight medical records that would support only Bipolar Disorder. *See Helms v. General Dynamics Corp.,* 222 Fed. Appx. 821 (11th Cir.2007) (finding it unreasonable and therefore arbitrary and capricious for plan administrator to excise snippets of medical evaluations to support its position while ignoring overwhelming portions of medical evidence that supported the plaintiff's claim).

Plaintiff's neuropsychological evaluations stating that

fluctuation in cognitive functioning, where some areas improve and other worsen with no clear neurologically based pattern is more consistent with a history of depression than dementia. The claimant demonstrated more areas of improvement than decline when the results of 2007 were compared to those of 2004. In most diagnosable dementias scores on memory testing are significantly lower than the results of intelligence testing: This was not true for the claimant as of the assessment in 2007.

(AR 544.) According to the 2007 neuropsychological evaluation, Plaintiff's IQ was 79 which fell at the "upper limit of the Borderline range." (AR 1887.) Plaintiff's "working memory and processing speed were 73, both falling in the borderline range" and were "significantly lower than her verbal and perceptual indices" and were noted to "predict problems with concentration, short term memory and paperwork." (AR 1887–1888.) Her verbal learning and memory fell from average and below average in 2004 to mildly impaired in 2007 which were indicators of problems with cognitive functioning.[22] (*Id.*)

Moreover, contrary to Dr. Murphy's characterization that Plaintiff demonstrated more areas of improvement than decline, the doctor who administered the

test, Dr. Carstens, noted that "testing shows some improvement since 2004 in the areas of attention (digit span repetition), visual-spatial processing and visual memory, left hand motor speed and reading recognition," but decline in other areas including "word list recall and recall of concern," areas of remote functioning, working memory and processing. (AR 1888.) Based on Plaintiff's social, medical, and family history, significant cognitive and behavioral decline, and brain imaging showing moderate to severe cerebral atrophy, Dr. Carstens concluded that she could not rule out a diagnosis of early dementia. (*Id.*)

Dr. Murphy rejected the validity of Plaintiff's 2009 neuropsychological evaluation noting "her presentation in the [examination] suggested more dysfunction than had been reported in the mental health notes. However, in conversation with Dr. Whitehurst it appeared that effort may have been an issue." (AR 543.) Dr. Murphy's implication that Plaintiff was malingering during the testing, based on her symptoms as noted in her treatment notes leading up to the test, is curious when it was precisely the persistence and severity of the symptoms that caused her treating doctors to order another neuropsychological evaluation. (AR 1116; AR 1118–1126; AR 1552, AR 1105–1117.) For example, in a "Psych form" dated April 17, 2009, another of Plaintiff's treating physician's Dr. Heinberg, stated that her current GAF[23]

---

**22.** Although no IQ score was given at the time of the 2004 neuropsychological evaluation, Plaintiff presented at that time to be "above average intelligence." (AR 468.) Moreover, the Court notes that a marked decline in Plaintiff's mental functionality was evident by 2009 in view of the reality that Plaintiff previously had successfully discharged a wide scope of management and technical duties through most of her career at IBM.

**23.** The Global Assessment of Functioning (GAF) scale is a numeric scale (0 through

100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults. *See* Am. Psychiatry Ass'n Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM–IV–TR). A GAF of 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR *major impairment* in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* at 34. A GAF of 50 indicates serious

was 43 which indicates major or serious impairment in judgment and thinking, and social and occupational functioning. (AR 246.) In addition, Dr. Murphy's statement that "due to her concerns about her finances, she appears to have exaggerated her functional difficulties on the examination of 6/10/09" is wholly unsupported by Dr. Whitehurst's report. Dr. Whitehurst noted that financial stressors from Plaintiff's recent episodes of spree shopping were contributing to her anxiety about money management and thus likely played a role "with regards to attention, cognitive acuity and concentration." (AR 1456.) However, Dr. Whitehurst, who would be in the better position to judge Plaintiff's credibility, expressed no concern over the validity of Plaintiff's symptoms and her functional capacity.[24]

Finally, Dr. Murphy's conclusion that Plaintiff's "longstanding memory complaints appear to be due to a pseudodementia associated with depression" is not supported by the entirety of Plaintiff's medical records. It appears that Dr. Murphy placed heightened focus on Plaintiff's symptoms of depression while rejecting evidence that Plaintiff's cognitive impairments did not improve after years of treatment for depression and Bipolar Disorder, especially considering Plaintiff's Bipolar Disorder was in partial remission at the time of the dementia diagnosis.[25] While the DSM–IV–TR does not discuss pseu-

dodementia, as noted above, it does address situations where cognitive problems may be attributed in part to depression. DSM–IV–TR, Dementia, at 153. The DSM–IV–TR provides that in determining whether cognitive symptoms are better accounted for by dementia or by depression, a "differential diagnosis may be informed by a thorough medical evaluation and an evaluation of the onset of the disturbance, the temporal sequencing of depressive and cognitive symptoms, the course of illness, family history, and treatment response." *Id.* Moreover, "if the clinician determines that both a dementia and Major Depressive Disorder are present with independent etiologies, both should be diagnosed." *Id.* It appears from the record that Dr. Stallings, Plaintiff's treating psychiatrist for eight years, considered these factors in evaluating Plaintiff's continuing course of cognitive decline and verified the diagnosis of dementia after reviewing Plaintiff's three neuropsychological evaluations. The Court finds that it was unreasonable and arbitrary for MetLife's three consultant reviewers to summarily reject Dr. Stallings findings where the DSM–IV–TR specifically cautions that its criteria should not be applied mechanically in a forensic review setting without due consideration of the entirety of the Plaintiff's subjective symptomatic presentation during the course of clinical treatment.

---

symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school function (e.g., unable to keep a job). *Id.*

**24.** Functional capacity is not synonymous with executive functioning. The Court understands from the evidence that a functional capacity evaluation is a set of tests, practices and observations that are combined to determine the ability of the person to function in a variety of circumstances, most often in employment, in an objective manner.

**25.** Indeed, Dr. Murphy's report acknowledges that Plaintiff's depressive disorder symptoms did "appear to be stabilizing" and that her "Bipolar was described as in partial remission in 2/09" while at the same time noting that she "has had cognitive complaints for the last 5 years" and "[f]unctionally, she has had significant problems with concentration, pace and task completion that would affect her ability to perform job duties." (AR 543.) Thus, his report appears somewhat internally inconsistent.

The only other report of substance on which MetLife relies as support for the reasonableness of its determination is the August 27, 2010 report that Dr. DeFillippis, Ph.D., provided in response to Plaintiff's appeal. Dr. DeFillipis relied on Plaintiff's treatment notes from 2001 to 2007, Plaintiff's three neuropsychological evaluations, the record reviews of MetLife's other IPCs Dr. Murphy and Dr. Walker, Plaintiff's Social Security determination, Plaintiff's letters of appeal, and MetLife's Claim Activity Log. (AR 405.) Dr. DeFillipis summarizes Plaintiff's medical history as presented in the records from 2001 to 2007 and concludes that "the notes do not indicate that the claimant consistently improved with treatment." (AR 407.) Dr. DeFillipis describes Plaintiff's historical symptoms of depression, mania, auditory hallucination and cognitive problems including impaired memory and concentration but notes "the records indicate that it was unclear if these problems were related to an organic disorder or her emotional problems." (AR 407–408.) Dr. DeFillipis acknowledges that "the records contain numerous forms completed by treatment providers that consistently say that the claimant was unable to work" and that "did not indicate that the claimant showed consistent improvement" with the most recent form from July 2010 noting her decline in function. (AR 408.) Dr. DeFillipis further references the July 23, 2010 questionnaire completed by Dr. Stallings in which Stallings describes why he disagrees with Dr. Murphy's prior opinion that the Plaintiff's cognitive impairments were the result of a pseudodementia associated with depression. Dr. Stalling rejected that position because, among reasons, "when [her] depression improved, her cognitive problems did not improve." (*Id.*) Dr. DeFillipis also summarizes from the prior reports Plaintiff's family history of depression, mental disorders and de-

mentia and references "moderate to severe cerebral atrophy was said to be present" in the 2007 MRI. (AR 407–409.)

With respect to the 2004 neuropsychological evaluation administered by Dr. Carstens, Dr. DeFillipis states:

> Dr. Carstens opined that the examinee's evaluation was abnormal with mild deficits in attention, working memory, processing speed and written arithmetic. Her presentation was thought to not be fully explained by depression or ADHD.... Dr. Carstens did not administer any effort measure. She did not give a personality test to rule out somatisation as an issue causing the claimant's problems. A full marital history was not taken. The claimant's typical daily activities were not recorded by Dr. Carstens. As noted, above, it is not clear if Dr. Carstens corrected the visual memory tasks for the poor copy. She noted that the poor copy might have been due to an odd grip of the pencil. This also was not commented on further by Dr. Carstens. Overall, because of these issues, I cannot utilize Dr. Carsten's report to identify any cognitive impairment in the claimant. Certainly, the problem with attention and processing speed could very well be related to the history of ADHD or emotional problems."

(AR 410.)

Dr. DeFillipis's criticism of Dr. Carstens's 2004 report for failing to administer effort measures is weighed against Dr. Carstens's personal observation that Plaintiff "was cooperative and there were no concerns about malingering or poor effort" and that the "results of the testing were considered accurate." (AR 468.) Moreover, if Plaintiff's doctors, the plan administrator, or the court were to attempt to make a diagnosis of dementia based on the results of the 2004 neuropsychological

evaluation alone, Dr. DeFillipis's criticisms might carry more weight. However, Plaintiff's diagnosis was based on her entire medical history from 2001 through 2009, and not on the results of a single neuropsychological evaluation performed *before* Plaintiff sought disability.

Dr. DeFillipis also discounts the results of the 2007 neuropsychological evaluation as part of the chain of evidence to support Plaintiff's dementia diagnosis. Again, despite the fact that Dr. Carstens again noted that Plaintiff was cooperative and evidenced good effort during testing such that the results were considered accurate, (AR 1653), Dr. DeFillipis criticizes the lack of effort testing by Dr. Carstens. (AR 411.) Dr. DeFillipis also makes some erroneous characterizations regarding the 2007 neuropsychological evaluation. First, Dr. DeFillipis states that "Dr. Carstens opined that the claimant showed improvement in cognitive testing." (AR 411.) More specifically, Dr. DeFillipis notes that "the claimant did somewhat better on verbal memory testing ... [,] processing speed was below average, as was the case during the previous evaluation." (AR 411.) Dr. Carstens's report actually notes a decline in Plaintiff's verbal learning and memory testing going from average/below average in 2004 to mildly impaired in 2007 on some of the tests and slight improvement with respect to Plaintiff's visual-spatial processing and visual memory skills. Contrary to Dr. DeFillipis's characterization of Plaintiff's processing speed test results, Dr. Carstens noted "Ms. Reid's scores certainly suggest some decline in working memory and processing speed relative to previous functioning, based on her achievement testing and occupational attainment. As this test was not given previously, it is not possible to calculate a course of decline." (AR 1654.) Dr. Carstens summarizes her conclusions regarding Plaintiff's test results, stating that

"there is slight decline in word list learning and recall of concern [and] new testing (WAIS–III) indicates likely declines relative to remote functioning, in the areas of working memory and processing speed." (AR 1655.) Based on these results, in combination with Plaintiff presenting with identical cognitive concerns voiced in 2004, her friend's observations that Plaintiff had suffered significant cognitive and behavioral decline in the last year, Plaintiff's family history of Alzheimer's, and her brain scan showing moderate to severe cerebral atrophy, Dr. Carstens concluded that Plaintiff was "still showing signs of cognitive disorder, which has not clearly worsened, but the question of etiology (bipolar disorder vs. early dementia) remains." (*Id.*) Compared to Dr. Carstens's summary of Plaintiff's test results, Dr. DeFillipis's report is overstated with respect to his opinion that the 2007 report demonstrated Plaintiff's cognitive improvement rather than decline. Thus, like the 2004 report, the 2007 is not determinative of Plaintiff's diagnosis of dementia but provides important background of her significant cognitive decline evidenced in 2009.

Finally, with respect to Plaintiff's 2009 neuropsychological evaluation in which she was diagnosed as having fronto-temporal dementia, Dr. DeFillipis baldly asserts that some of Plaintiff's test responses are not typical of people with dementia. Dr. DeFillipis's report does not acknowledge the American Psychiatry Association's statement in the DSM–IV–TR regarding limitations on categorical approaches to diagnoses of mental disorders and that the clinician "should therefore consider that individuals sharing a diagnosis are likely to be heterogeneous even in regard to the defining features of the diagnoses and that boundary cases will be difficult to diagnose in any but a probabilistic fashion." DSM–IV–TR, Issues in the Use of DSM–IV, at

xxi. As with the 2004 neuropsychological evaluation, Dr. DeFillipis concludes that he cannot utilize Dr. Whitehurst's evaluation to definitively identify an organic cognitive disorder[26] in Plaintiff and notes that the 2009 evaluation along with others demonstrates Plaintiff had significant emotional issues that apparently undermined in his view the same persistence and severity of her cognitive impairments. (AR 413.) Dr. DeFillipis criticizes Dr. Whitehurst for failing to rule out dissociative causes of Plaintiff's cognitive problems but essentially ignores the evidence that Plaintiff failed to show cognitive functioning improvement from treatment for her Bipolar Disorder and ignores the possibility or probability that Plaintiff suffered from both dementia and dissociative disorder.

With respect to the 2007 MRI of Plaintiff's brain, Dr. DeFillipis states that "brain atrophy does not, by itself consistently cause cognitive problems. These would have to be substantiated by a pattern of test results consistent with organic brain disease." (AR 415.) Dr. DeFillipis's report is internally inconsistent. On the one hand he acknowledges Plaintiff has cognitive problems (but believes they are associated with a psychological etiology), and on the other hand he states that in order for the cognitive problems to exist they would have to be substantiated by a pattern of tests (which he has rejected). The Court finds that Plaintiff has presented credible evidence of such "a pattern of test results consistent with organic brain disease," i.e., dementia, as conclusively evidenced by Plaintiff's cerebral atrophy. See DSM–IV–TR, Dementia, at 150 (stating that the abnormalities in cognitive and memory functioning that occur with Dementia can be assessed using mental status examinations and neuropsychological testing, and neuroimaging such as computed tomography (CT) and magnetic resonance imaging (MRI) revealing cerebral atrophy as an indicator of Dementia). The evidence is even more compelling considering the specific type of dementia Plaintiff was diagnosed as having—frontotemporal dementia. The National Institute of Neurological Disorders and Stroke, a division of the National Institutes of Health, defines Frontotemporal Dementia (FTD) as:

a clinical syndrome associated with shrinking of the frontal and temporal anterior lobes of the brain. Originally known as Pick's disease, the name and classification of FTD has been a topic of discussion for over a century. The current designation of the syndrome groups together Pick's disease, primary progressive aphasia, and semantic dementia as FTD. Some doctors propose adding corticobasal degeneration and progressive supranuclear palsy to FTD and calling the group Pick Complex. These designations will continue to be debated. As it is defined today, the symptoms of FTD fall into two clinical patterns that involve either (1) changes in behavior, or (2) problems with language. The first type features behavior that can be either impulsive (disinhibited) or bored and listless (apathetic) and includes inappropriate social behavior; lack of social tact; lack of empathy; distractability; loss of insight into the behaviors of oneself and others; an increased interest in sex; changes in food preferences; agitation or, conversely, blunted emotions; neglect of personal hygiene; repetitive or compulsive behavior, and decreased energy and motivation. The second type primarily features symptoms of language disturbance, including difficulty making or understanding speech, of-

---

**26.** It appears MetLife treated Plaintiff's cognitive disorder the same as dementia rather than as a separate disorder for purposes of determining eligibility of benefits.

ten in conjunction with the behavioral type's symptoms. Spatial skills and memory remain intact. There is a strong genetic component to the disease; FTD often runs in families.

National Institutes of Health, National Institute of Neurological Disorders and Stroke, NINDS Frontotemporal Dementia Information Page, http://www.ninds.nih.gov/disorders/picks/picks.htm (last visited Mar. 29, 2013).[27]

MetLife, in relying solely on the findings of these IPC file reviews that consistently reject without explanation any possibility of dementia in the Plaintiff, has not put forth substantial evidence in support of the reasonableness of its determination. Indeed, in using a cookie-cutter approach to diagnosing the cause of Plaintiff's disability, all of MetLife's reviewing physicians fail to follow the DSM–IV–TR's "flexible" outlook that "encourages more specific attention to boundary cases, and emphasizes the need to capture additional clinical information that goes beyond the diagnosis." DSM–IV–TR, Issues in the Use of DSM–IV, at xxi-xxii. According to the DSM–IV–TR, Plaintiff need not present with all areas of cognitive decline that are tested during a neuropsychological evaluation. To satisfy the diagnostic criteria for de-

mentia, Plaintiff need only demonstrate memory impairment and at least one of the following cognitive disturbances: aphasia (language), apraxia (motor/sensory), agnosia (visual/spatial), or a disturbance in executive functioning (related especially to disorders of the frontal lobe). Thus, the evidence that Plaintiff showed language abnormalities, consistent decline in her verbal memory and recall, working memory, and processing speed that were determined by her doctors (and MetLife's IPCs) severe enough to cause significant impairment in her occupational functioning is enough to substantiate a diagnosis of dementia. DSM–IV–TR, Dementia, at 148–149. Moreover, such a diagnosis is confirmed by her neuroimaging results showing cerebral atrophy. DSM–IV–TR, Dementia, at 150. Even Plaintiff's symptoms of depression, mania, dissociate episodes, and auditory hallucinations—which MetLife's IPCs attribute to Plaintiffs' other mental disorders—are consistent with a diagnosis of dementia according to the DSM. *See* DSM–IV–TR, Dementia, at 148–154.

■ While it is true that plan administrators are not required to accord per se special evidentiary weight to the opinions of treating physicians, "[p]lan administra-

**27.** The National Institutes of Health (NIH), a part of the U.S. Department of Health and Human Services, is the nation's medical research agency. The National Institute of Neurological Disorders and Stroke, is a division of the National Institutes of Health. The Court is authorized to take judicial notice of additional sources of medical authority in its review of technical medical terminology. *See Vega v. National Life Ins. Services, Inc.,* 188 F.3d 287, 299 (5th Cir.1999) (stating that "[a]s an exception to the rule that court is limited to evidence in administrative record, a court may consider evidence explaining medical terms and procedures relating to the claim"), *overruled on other grounds by Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); *Crosby v. Louisiana Health Ser-*

*vice and Indem. Co.,* 629 F.3d 457, 460–61 (5th Cir.2010), superseded on other grounds by 647 F.3d 258 (5th Cir.2011); *Krohmer–Burkett v. Hartford Life & Acc. Ins. Co.,* 803CV873T30MAP, 2005 WL 2614503, at *3, n. 6 & n. 8 (M.D.Fla. Oct. 14, 2005) (taking judicial notice of definition from Merriam Webster Medical Dictionary's website of meaning of "stenosis" of the American Occupational Therapist Association, Inc.'s website definition of the acronym FCE as a Functional Capacity Evaluation); *see also Wangenstein v. Equifax, Inc.,* 191 Fed.Appx. 905, 917 (11th Cir.2006) *(citing Dorland's Illustrated Medical Dictionary 1564 (28th ed. 1994)* and 295 J. Am. Med. Ass'n 2320 (May 17, 2006) for definitions and diagnostic features of Cervical spondylosis, Myelopathy, and Migraines).

tors may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[28] *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Accordingly, following the Supreme Court's opinion in *Nord,* even though "courts have recognized that the opinions of treating physicians should not necessarily be accepted over those of reviewing experts simply because the treating physicians physically examined the claimant," reliance on an independent file review to the exclusion of equally credible evidence of the plaintiff's treating physician may nevertheless be inadequate under the arbitrary and capricious standard. *E.g., Smith,* 275 Fed.Appx. at 507–508 (citing *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 293–94 (6th Cir.2005); *see also e.g., Oliver v. Coca Cola Co.,* 497 F.3d 1181, 1199 (11th Cir.2007)) (finding plan administrator acted arbitrarily and capriciously where "Coca–Cola denied Oliver's claim not on the basis of conflicting, reliable evidence—a practice we have upheld, ...—rather, it simply ignored relevant medical evidence in order to arrive at the conclusion it desired."); *Creel v. Wachovia Corp.,* No. 08–10961, 2009 WL 179584, at *8 n. 22 (11th Cir. Jan. 27, 2009) ("[T]he decision not to accord special weight to the views of the claimant's physician must be based on 'reliable evidence,' which would involve something more than a paper-based peer review for disabilities involving

subjective proof."); *Kinser,* 488 F.Supp.2d at 1382 (finding that MetLife was wrong and unreasonable to essentially ignore the claimant's treating physician's clearly stated and supported opinion in favor of non-treating, non-examining psychiatrist's file review); *Brucks v. Coca–Cola Co.,* 391 F.Supp.2d 1193, 1205 (N.D.Ga.2005) (noting that in cases involving the termination of benefits "it is not surprising that a court ... would look for an independent medical examination to explain the administrator's" decision); *Satterwhite v. Metropolitan Life Ins. Co.,* 803 F.Supp.2d 803, 808–809 (E.D.Tenn.2011); *Sheehan v. Metropolitan Life Ins. Co.,* 368 F.Supp.2d 228 (S.D.N.Y. 2005).

In those situations where a diagnosis is based in part on subjective rather than purely objective findings, including diagnoses of various mental disorders, courts routinely find that the failure to conduct a physical examination may, in some cases, raise questions about the thoroughness and accuracy of a benefits determination. *See, e.g., Smith,* 275 Fed.Appx. at 507–508 (summarizing cases holding that administrator's decision not to perform an independent medical examination "supports the finding that their determination was arbitrary"); *Calvert,* 409 F.3d at 295 (finding that where "credibility determinations regarding a claimant's medical history and symptomology" are required, reliance on a file-only review "may be inadequate"); *Sheehan,* 368 F.Supp.2d at 228[29] (noting

---

**28.** The Court in *Nord* recognized that "[a]s compared to consultants retained by a plan, it may be true that treating physicians, as a rule, 'have a greater opportunity to know and observe the patient as an individual.' [T]he assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the

treating physician lacks." *Nord,* 538 U.S. at 832, 123 S.Ct. 1965. These concerns do not exist in this case.

**29.** "Although the court in *Sheehan* engaged in de novo review ... *Sheehan's* point is still relevant for our, albeit deferential, review of the medical evidence, because *Sheehan* highlights the inadequacy of record review when determining benefits for someone claiming a mental disability. An examination could have helped the plan administrator to better evalu-

that a psychiatrist evaluating a patient's mental health relies heavily on their ability to observe the patient's mannerisms, demeanor, and expressions and therefore inherently involves credibility determinations). Thus, in these types of cases the plan administrator's failure to conduct an Independent Medical Examination available to it under the plan may show that its review of the claimant's file was unreasonable. *E.g., Satterwhite,* 803 F.Supp.2d at 809; *Elliott v. Metropolitan Life Ins. Co.,* 473 F.3d 613, 621 (6th Cir.2006) (discussing a plan's refusal to obtain an IME and stating that "[a]lthough we continue to believe that plans generally are not obligated to order additional tests ... plans can assist themselves, claimants, and the courts by helping to produce evidence sufficient to support reasoned, principled benefits determinations"). "This is especially true when the only medical evidence contradicting the treating physician comes from a non-examining consultant." *Hoover v. Provident Life and Accident Ins. Co.,* 290 F.3d 801, 809 (6th Cir.2002) (finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company); *Oliver v. Coca Cola,* 497 F.3d at 1199 ("By relying on Dr. Goldberg's flawed peer review as a basis for denying Oliver's LTD benefits claim, and by failing to review relevant medical evidence that supported Oliver's claim, Coca–Cola acted arbitrarily and capriciously.").

In *Creel v. Wachovia Corp.,* the Eleventh Circuit, in an unreported decision found that a plan administrator took insufficient action to justify its denial of benefits where,

> though [Plaintiff's] file had been reviewed by three IPCs, [the administrator] never requested an IME to test the veracity of her complaints, even though the Plan permitted it to do so. Given that at least two of the IPCs, Drs. Kurt and Parcells, recognized that the evidence showed that she was suffering from headaches that were subjectively incapacitating, such an action would have been warranted. An IME might have provided a better foundation for analyzing her claim than the paper-based IPC reviews.

2009 WL 179584, at *8. As the Court in *Kinser* concluded, "it is unreasonable for [MetLife] to essentially disregard the opinion of Plaintiff's treating psychiatrist in favor of an opinion of a non-treating, non-examining psychiatrist" [in the instant case, a neuropsychologist who was not a M.D.] based on a one-time file review and having never personally examined or spoken to the Plaintiff. 488 F.Supp.2d at 1383. Indeed, in such a complicated case as this one, "[t]here can be no serious doubt that a psychiatric opinion of a treating psychiatrist is more reliable than an opinion based on a one-time file review." *Id.* The Second Circuit took a similar approach in *Winkler v. Metropolitan Life Ins. Co.,* 170 Fed.Appx. 167, 168 (2d Cir. 2006), and under an arbitrary and capricious standard rejected the MetLife plan administrator's decisions based "entirely on the opinions of three independent consultants who never personally examined [the plaintiff], while discounting the opinions of [the plaintiff's] three treatment

---

ate the severity of [Plaintiff's] symptoms." *Smith v. Bayer,* 275 Fed.Appx. 495, 508 (6th Cir.2008) (citing *Smith v. Continental Cas. Co.,* 450 F.3d 253, 263 (6th Cir.2006) (under arbitrary-or-capricious standard, where credibility determination was key component of assessing disability, reliance solely on file review, without an independent examination, was inadequate)).

providers and one independent examiner." Citing *Nord,* the Second Circuit held that "[w]hile administrators may credit their own reliable evidence over the statements of treatment providers, [ ] MetLife's exclusive reliance on second-hand opinions adds to the overall picture of its decision as less than fair. First-hand observation is especially important in the context of assessing psychiatric disabilities." 170 Fed.Appx. at 168.

MetLife based its decision entirely on the opinions of three independent consultants who never personally examined Plaintiff, while discounting the opinions of the doctors who examined and treated her.[30] Moreover, Metlife's review of Plaintiff's medical records fails to squarely address the issue that Plaintiff's comorbid illnesses of Bipolar Disorder/Depression, Cognitive Disorder, and Dementia rendered her disabled.[31] *See Sheehan,* 368 F.Supp.2d at 258 (accepting opinions of the plaintiff's treating physicians that his disability was the result of the combined effect of two comorbid illnesses because their opinions were worthy of belief, clinically sound, and not addressed or contradicted by the opinions of MetLife's medical experts, who focused solely upon the plaintiff's psychiatric conditions and did not discuss comorbidity); *Winkler v. Metropolitan Life Ins. Co.,* 170 Fed.Appx. at 168. While administrators may credit their own reliable evidence over the statements of treatment providers, MetLife's exclusive reliance on second-hand opinions and refusal to credit reliable evidence of Plaintiff's treating physicians or such physicians' consideration of the significance of an MRI showing Plaintiff's brain atrophy as part of their diagnosis was arbitrary and capricious. *See Nord,* 538 U.S. at 834, 123 S.Ct. 1965; *Oliver,* 497 F.3d at 1199; *Creel,* 2009 WL 179584, at *8.

As the Court finds that MetLife's determination was not based on reasonable grounds and was an abuse of discretion, it is not necessary to consider the final factor of inherent conflict of interest.[32]

## III. CONCLUSION

Accordingly, the Court **REVERSES** MetLife's determination to terminate Plaintiff's long term disability benefits after 24 months and **ORDERS** that MetLife reinstate continued long term disability benefits up to the maximum benefits date provided in the Plans. In addition, the Court **GRANTS IN PART** and **DENIES IN PART** MetLife's counterclaim for overpayment of benefits pursuant to the Plans. The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff and close the case. Plaintiff is **DIRECTED** to file her motion for fees within 14 days as provided by Fed.R.Civ.P. 54(b) and to file her supplemental itemization providing support and grounds for her fee entitlement under

---

30. In addition, consistent with MetLife's pattern of ignoring supporting evidence on Plaintiff's dementia diagnosis, MetLife ignored evidence that while Plaintiff had not improved from medications prescribed to treat her symptoms of bipolar, the Aricept prescribed to treat her dementia in 2010 had some positive impact on stalling additional cognitive decline.

31. As recognized by Dr. Stallings, the fact that Plaintiff suffered from all these illnesses demonstrated the complexity of her diagnosis.

32. The Court **GRANTS IN PART** and **DENIES IN PART** MetLife's counterclaim for overpayment of benefits pursuant to the Plans. As the Court has found that Plaintiff is entitled to additional long term disability benefits, the Court will not order Plaintiff to repay MetLife directly the amount of the overpayment but instead will allow MetLife to offset such amount in its payment of the retroactive award of benefits owed to Plaintiff as a result of this Order.

ERISA within 30 days of her motion in accordance with LR 54.2.